UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA NAACP, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., <br><br> *Defendants*. | No. 1:16-cv-1274 |

## [AMENDED] BRIEF IN SUPPORT OF APPLICATION FOR TEMPORARY

## RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION ..................................................................... 1

BACKGROUND ....................................................................... 3

    A.    Statutory Background ....................................................... 3

        1.    The National Voter Registration Act .............................. 3

        2.    North Carolina's Challenge Procedures........................... 4

    B.    Defendants' Purge of Registered Voters .............................. 6

    C.    Plaintiffs' Protests of the Unlawful Practices ................... 11

ARGUMENT......................................................................... 12

    A.    Plaintiffs Are Entitled to Immediate Injunctive Relief.................. 12

        1.    Plaintiffs Have an Overwhelming Likelihood of Success on the Merits of Their Claims............................................. 13

            a.    Defendants' Challenge and Purge Procedures Violate the NVRA's Prohibition on Removal of Registered Voters Without Adequate Notice and a Two-Year Waiting Period. ........................................... 13

            b.    Defendants' Challenge and Purge Procedures Violate the NVRA's Prohibition on Systematic Removal Procedures Within 90 Days of an Election. ................................................................ 17

        2.    Absent Immediate Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm, Enforcement of the NVRA Serves the Public Interest, and the Balance of Hardships Favors Issuance of an Injunction .............................. 22

    B.    Injunctive Relief Should Be Framed to Ensure Voters' Ballots Are Counted ........................................................... 26

    CONCLUSION....................................................................... 27

<h1 style="text-align:center"><u>TABLE OF AUTHORITIES</u></h1>

**Federal Court Cases**

*A. Philip Randolph Inst. v. Husted*,
   ___ F.3d ___, 2016 WL 5328160 (6th Cir. Sept. 23, 2016) ........................................ 13

*Arcia v. Florida Sec'y. of State*,
   772 F.3d 1335 (11th Cir. 2014) ......................................................................... 17, 18, 20

*City of Greensboro v. Guilford County Bd. of Elections*,
   120 F.Supp.3d 479 (M.D.N.C. 2015) ............................................................................ 22

*Illinois State Bd. of Elections v. Socialist Workers Party*,
   440 U.S. 173 (1979) ...................................................................................................... 25

*League of Women Voters of North Carolina v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ............................................................................. 22, 25, 26

*League of Women Voters of United States v. Newby*,
   __ F.3d __, 2016 WL 5349779 (D.C. Cir. Sept. 26, 2016) .......................................... 25

*Montana Democratic Party v. Eaton*,
   581 F.Supp.2d 1077 (D. Mont. 2008) ..................................................................... 17, 18

*North Carolina State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ........................................................................................ 22

*Obama for America v. Husted*,
   697 F.3d 423 (6th Cir. 2012) .................................................................................. 22, 25

*Project Vote/Voting for America, Inc. v. Long*,
   813 F.Supp.2d 738 (E.D. Va. 2011) ............................................................................. 25

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ......................................................................................................... 25

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ..................................................................................................... 26

*United States Student Assn Found. v. Land*,

    546 F.3d 373 (6th Cir. 2008) .................................................................. 13, 14

*Williams v. Salerno*,

    792 F.2d 323 (2d Cir. 1986) ........................................................................ 22

*Winter v. Natural Res. Defense Council*,

    555 U.S. 7 (2008) ......................................................................................... 13

**Federal Statutory Authorities**

52 U.S.C. §20501(a) ....................................................................................... 17

52 U.S.C. §20501(b) ........................................................................... 3, 17, 21

52 U.S.C. §20507(a) ......................................................................................... 3

52 U.S.C. §20507(c) ................................................................................*passim*

52 U.S.C. §20507(d) ...............................................................................*passim*

52 U.S.C. §20507(e) .................................................................................. 3, 16

**State Statutory Authorities**

N.C.G.S. §132-1 ............................................................................................... 7

N.C.G.S. §163-82.14(d) .................................................................................. 5

N.C.G.S. §163-85 ............................................................................... 18, 26, 27

N.C.G.S. §163-85(a) ........................................................................................ 5

N.C.G.S. §163-85(d) ................................................................................... 5, 18

N.C.G.S. §163-85(e) ................................................................................... 5, 18

N.C.G.S. §163-86 ........................................................................... 4, 18, 26, 27

N.C.G.S. §163-86(b) ........................................................................................ 5

N.C.G.S. §163-86(c) ................................................................................... 5, 18

N.C.G.S. §163-87 ........................................................................................... 27

N.C.G.S. §163-88.1(a) ................................................................................... 24

N.C.G.S. §163-90.2(a) ........................................................................................4, 24

N.C.G.S. §163-166.11...................................................................................23, 24

N.C.G.S. §163-182.15(e) ..................................................................................5, 23

# INTRODUCTION

The National Voter Registration Act ("NVRA") protects Americans' fundamental right to vote by, *inter alia*, requiring that states meet certain requirements before cancelling a voter's registration on the basis of a change in residence. Specifically, states must either (1) receive written confirmation from the voter that he or she has moved to a different residence outside the county, or (2) send a prescribed notice to which the voter fails to respond, and then wait for two federal election cycles in which the voter does not vote. Only after written confirmation, or notice, no response, and the two-cycle waiting period, may a state proceed with removal from the voter registration rolls. 52 U.S.C. §20507(d). The NVRA also protects access to the franchise by prohibiting any systematic program to remove voters from the rolls within 90 days of a federal election. *Id.* §20507(c)(2)(A).

In recent weeks and months, and in direct violation of the NVRA, Boards of Elections ("BOEs") in at least three North Carolina counties have cancelled thousands of voters' registrations on the basis of an alleged change in residence. Those purges of voter rolls resulted from proceedings that were triggered by challenges filed by private individuals, based on a single mailing returned as undeliverable. In most cases, these cancellations of registrations were supported by no other evidence—and none were supported by written confirmation from the voters of any alleged change in residence or compliant with the NVRA's notice and waiting-period provisions. In many cases, the North Carolinians purged from voting rolls through these proceedings still reside at the

addresses where they are registered, or have moved within the same county and remain eligible to vote there. Nonetheless, single items of returned mail have resulted in cancellation of their registrations.

The State Board of Elections ("SBOE") defends these mass cancellations by pointing to state statutes that authorize private individuals to challenge voter registrations on the basis of returned mailings. But those statutes cannot be implemented in a manner that violates the NVRA, which is exactly what Defendants have done and continue to do. In the last weeks before closely contested federal elections, thousands of North Carolinians have been stripped of their right to vote in violation of federal law.

Because Defendants' continuing unlawful conduct irreparably harms North Carolina voters, Plaintiffs seek entry of a temporary restraining order ("TRO") to enjoin further voter purges in violation of federal law, require restoration to the voting rolls of those wrongfully purged, and ensure the provision of meaningful curative notice to those voters already harmed.

On October 29, 2016, Plaintiffs notified the General Counsel for the SBOE and a Senior State Deputy Attorney General of this impending lawsuit and TRO application, and that Plaintiffs would be requesting a November 1 TRO hearing. On October 30, 2016, Plaintiffs sent e-mail notice to the County Boards of Elections Directors and counsel with the same information. Plaintiffs have not received any responses from the county BOEs, and the SBOE attorneys have responded but not stated a position regarding the proposed TRO or on the request for a November 1 TRO hearing. Plaintiffs request a

Tuesday, November 1, 2016 hearing for argument on this TRO application so that voters'
rights may be restored before the November 8 election.

## BACKGROUND

### A. Statutory Background

#### 1. The National Voter Registration Act

Congress enacted the NVRA to "increase the number of eligible citizens who
register to vote in elections for Federal office . . . ; to protect the integrity of the electoral
process; and to ensure that accurate and current voter registration rolls are maintained."
52 U.S.C. §20501(b).  To those ends, the NVRA requires states to "ensure that any
eligible applicant is registered to vote in an election" if the voter submits a valid
registration form at least 30 days before a federal election.  52 U.S.C. §20507(a)(1).
Once a voter is registered, the NVRA imposes strict safeguards against improper removal
from voting rolls.  *Id.* §20507(a)(3)-(4).

As relevant here, the NVRA requires that states comply with certain mandates
before removing registered voters on the basis of changes in residence.  States must either
receive written confirmation from a voter that he or she has moved to a residence outside
of the county, or send the voter a prescribed notice, receive no response, and wait for two
federal election cycles in which the voter does not vote.  52 U.S.C. §20507(d).

Relatedly, the NVRA expressly requires states to count the votes of individuals
who have moved to a new precinct within the same county, regardless of whether they
have re-registered at that address, submitted a change-of-address form, or responded to a

notice sent pursuant to 52 U.S.C. §20507(d).  *See* 52 U.S.C. §20507(e), (f).  Thus, separate and apart from the notice and timing requirements of 52 U.S.C. §20507(d), the mere fact that someone has left a given precinct is, by itself, a legally insufficient reason to cancel their registration.

The NVRA's safeguards are particularly stringent during the period leading up to a federal election.  Specifically, states must "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. §20507(c)(2)(A).  The only exceptions to this provision are for removal at a voter's request or on the basis of a criminal conviction, determination of incompetence, or death.  *Id.* §20507(c)(2)(B).

The *en masse* challenges and voter purges described herein violate 52 U.S.C. §§20507(d), 20507(e) & (f), and 20507(c)(2)(A).

### 2.  North Carolina's Challenge Procedures

North Carolina statutes authorize any voter to challenge the eligibility of another voter in the same county up until 25 days before a primary, general, or special election. Under this state law, challenges may be sustained on a number of grounds, including that a challenged voter is not a resident of the county or of the precinct where he or she is registered to vote.  N.C.G.S. §163-85(a), (c)(2), (c)(3); *id.* §163-86; *id.* §163-90.2.

A county board of election that receives a challenge under these provisions must schedule a preliminary hearing (of which the challenged voter need not be notified).  *Id.*

Case 1:16-cv-01274-LCB-JLW   Document 21-1   Filed 10/31/16   Page 9 of 34

§163-85(d). At that preliminary hearing, "presentation of a letter mailed by returnable first-class mail to the voter at the address listed on the voter registration card and returned because the person does not live at the address shall constitute prima facie evidence that the person no longer resides in the precinct." *Id.* §163-85(e). If the board "finds that probable cause exists that the person challenged is not qualified to vote," the board schedules a follow-up hearing. *Id.* §163-85(d).

The county board sends mailed notice of the follow-up hearing to the challenged voter (but that notice, in most cases at issue here, was by letter sent to the same registration address from which mail has already been returned as undeliverable). *Id.* §§163-85(d), 163-86(b). Then, at the hearing, the challenged voter's registration is cancelled unless the voter appears in person and testifies to his or her qualifications under oath or submits a sworn affidavit confirming residency in the same precinct where he or she is registered. *Id.* §163-86(c).[1]

---

[1] In sharp contrast to these challenge provisions, other provisions of North Carolina law actually incorporate the protections of the NVRA. *See*, *e.g.*, N.C.G.S. §163-82.14(d) (providing for NVRA-compliant list maintenance procedures including address updates and removal of ineligible voters after notice and two federal election cycles); *id.* §163-82.14(d)(3) (requiring that voters removed from rolls under §163-82.14(d) be allowed to cast valid ballots if they show up to vote even if their address has changed); *id.* §163-82.15(e) (permitting voters to cast valid ballots if they have moved within a county). The state legislature may simply have overlooked the challenge provisions and failed to update them when the NVRA provisions were added to state law. Whatever the explanation for the apparent inconsistency between North Carolina statutory provisions authorizing challenges to/cancellation of registrations of voters who have moved within the county while simultaneously affirming their eligibility to vote, the counties' recent implementation of the challenge procedures has plainly violated the federal NVRA.

### B. Defendants' Purge of Registered Voters

Plaintiffs recently learned that large-scale voter challenges and purges have been occurring, and continue to occur, throughout North Carolina, including in Beaufort, Moore, and Cumberland Counties. In the waning weeks and months before the November 8, 2016 general election, a few individuals have submitted *en masse* challenges, and county BOEs have sustained most of these challenges, purging thousands of voters from the rolls on the basis of single returned mailings and in violation of the NVRA.

***Beaufort County.*** In Beaufort County, four individuals submitted forms in or around October 2016 challenging at least 138 registered voters solely on the basis of 2015 campaign mailings that were returned as undeliverable. Barber Dec. ¶¶15, 23; Bonds Dec. Ex. E. Fifty-nine of the challenged citizens are active voters, including nineteen who voted within the last year. Barber Dec. ¶23. More than 65% of the challenged voters are African American, even though African Americans make up only 26% of Beaufort County's population. *Id.*; Bonds Dec. ¶15 & Ex. E; *see* Ward Dec. ¶4; http://www.co.beaufort.nc.us/residents/demographics.

The Beaufort BOE held preliminary hearings on these challenges on October 7 and 14, 2016. Barber Dec. Ex. E at 2 n.9. The challenges were set for formal hearings on October 24 and 29, 2016 (during the first week of early voting), although the BOE members acknowledged that most voters would not attend such hearings and stated repeatedly that the registrations of voters who did not attend would be automatically

cancelled.  *See id.*; Cole Dec. ¶8.  The BOE members also noted that some of the mailings triggering challenges had been sent to voters' residential address rather than to their mailing address (and for many voters who cannot receive mail at their homes those addresses differ and it is no surprise that mail to their residences would be returned, *see, e.g.*, Hardison Dec. ¶3; Cox Dec. ¶5), but the BOE set those challenges for hearing anyway.  Cole Dec. ¶¶6, 14.

The Beaufort BOE attempted to notify challenged voters of the October 24 and 29 hearings by sending them letters addressed in many cases to the same addresses from which prior mailings had been returned as undeliverable.  *See* Barber Dec. Ex. E; Bonds Dec. ¶6 & Ex. C.  Unsurprisingly, no challenged voters appeared for the October 24, 2016 hearing.  *See* Ward Dec. ¶9.

In the limited time between publication of the challenge list and the formal hearings, several Good Samaritans were able to contact and offer assistance to some of the challenged voters, several of whom had not received any notice of the hearings and were unaware that their eligibility was being challenged.  Ward Dec. ¶¶3-8, 11; Cox Dec. ¶¶7-14; Hardison Dec. ¶5.  The Good Samaritans helped challenged voters draft and submit affidavits and attended the hearings on their behalf, and as a result of their efforts, the registration of several challenged voters was upheld.  *See* Ward Dec. ¶; Cox Dec. ¶; Hardison Dec. ¶8; Bonds Dec. Ex. D.  Were it not for the assistance of the Good Samaritans, these voters would in all likelihood have been purged from the rolls, as were many other challenged voters whom the Good Samaritans were unable to reach in time.

One of the Good Samaritans, Veronica Ward, also presented testimony on behalf of several challenged voters at the BOE's October 29 hearing, demonstrating that the voters still live in Beaufort County. For example, Ms. Ward testified that she personally visited one of the challenged voters at the residence in dispute, and no evidence to the contrary was presented. Bonds Dec. ¶12. Nevertheless, the Beaufort BOE did not reject the challenge to that voter's registration but instead postponed hearing it until November 7 – the day before Election Day – for the stated purpose of allowing the challenger to withdraw his challenge. *Id.* The Beaufort BOE also postponed hearings on 11 other individual challenges to November 7, meaning that challenges to 12 voters will remain pending at least until the day before Election Day. *Id.* The Board members stated that unless the voter attended the November 7 hearing or the challenge was withdrawn, the voter registration would automatically be cancelled. Cole Dec. ¶¶8, 15-16.

Many of the voters challenged or actually removed from the voter rolls, including plaintiffs James Edward Arthur Sr., Grace Bell Hardison, and James L. Cox, are registered voters who currently reside within Beaufort County and are eligible to vote (or would be eligible had their registrations not been cancelled). *See* Arthur Dec. ¶¶2-5, 9, 15; Hardison Dec. ¶¶2, 4; Cox Dec. ¶¶2-4, 6, 17; Barber Dec. ¶¶12-13. Many of the challenged voters have not changed their residence but do not receive mail at their residence for various reasons, *see* Hardison Dec. ¶3; Cox Dec. ¶5; Bonds Dec. Ex D; mail to many others was returned because they moved to another residence within Beaufort County (which should not have affected their eligibility to vote), *see* Arthur Dec. ¶¶2-6.

Mr. Arthur, for example, is a lifelong resident of Beaufort County and an active voter whose registration was cancelled after he moved to a nursing home and mail sent to his old address was returned as undeliverable. Arthur Dec. ¶¶2-9. Mr. Arthur did not learn that his registration had been challenged until after it had already been cancelled. *Id.* ¶¶10-11. At the hearing on the challenge to Mr. Arthur's registration, the Beaufort BOE was told that he had moved to a nursing home within the same county, but *nonetheless voted to cancel his registration.* Cole Dec. ¶¶12-13.

Ms. Hardison and Mr. Cox are also lifelong Beaufort County residents and active voters. They receive mail only at P.O. Boxes, not at their residential addresses. Hardison Dec. ¶¶2-4; Cox Decl. ¶¶2, 5-6; Bonds Dec. Ex. D. Ms. Hardison and Mr. Cox did not know they were being challenged until told by a Good Samaritan, and only with the Good Samaritan's assistance were they able to submit evidence to the Beaufort BOE confirming their eligibility to vote. As a result of that assistance, they believe the challenges against them have been withdrawn, although the Beaufort BOE never confirmed the withdrawal in writing, and they remain fearful that when they show up to vote on Election Day, they will be told they are not registered and denied the right to vote. *See* Hardison Dec. ¶¶5-10; Cox Dec. ¶¶7-16; Bonds Dec. Ex. E.

As of October 27, the Director of the Beaufort BOE has said that she is unsure what to tell voters whose registrations have been cancelled about whether they may cast provisional ballots on November 8. Bonds Dec. ¶¶7-10. As of October 31, 2016, Plaintiffs are aware of no notice that has gone out to Beaufort County registrants removed

at either the October 24 or October 29 hearing, even though absentee-by-mail voting is ongoing and only a few days of early voting remain.

**Moore County.** Similar practices have occurred and continue to occur in Moore County. In July 2016, one individual challenged approximately 400 registered voters solely on the basis of returned postcards that had been sent out in a mass mailing, which the challenger relied on as evidence that "[t]he person is not a resident of the precinct in which the person is registered." Watkins Dec. ¶¶11-12 & Exs. A-B; Barber Dec. ¶22. Upon receiving those challenge forms, the Moore CBOE sent letters to the challenged voters, presumably in most cases to the same addresses from which the prior mailings had been returned as undeliverable, purportedly notifying them of a formal hearing set for October 14, 2016. Watkins Dec. ¶13; *see* Barber Dec. Ex. E at 2 n.10. No challenged voters appear to have attended the hearing. *See* Watkins Dec. ¶¶14-15. The Moore BOE sustained nearly all of the several hundred voter registration challenges and removed the challenged citizens from the voter rolls, apparently in many cases on the basis of a single returned postcard. Watkins Dec. ¶16; Bonds Dec. ¶17.

**Cumberland County.** Similar voter challenge and registration cancellations have occurred, and continue to occur, in Cumberland County as well. Almost 4,000 Cumberland County voters were challenged in August and September of this year, all of which were submitted by a single individual. Barber Dec. ¶¶14, 21 & Ex. E; Bonds Dec. Ex. F. As in Moore and Beaufort Counties, the Cumberland challenges were based on

returned mail from mass mailings. Barber Dec. ¶¶21, 24 & Ex. E at 1-2.[2] It appears that the vast majority of these voters had their registration cancelled. Taylor Dec. ¶23.

In sum, thousands of eligible North Carolina voters have been challenged and, in many cases, wrongfully purged from voter rolls without complying with the NVRA's mandated notice and timing requirements.

### C. Plaintiffs' Protests of the Unlawful Practices

Upon learning of the State's unlawful conduct, the North Carolina NAACP took steps to notify the State and petition for immediate relief—to no avail.

After the October 14, 2016 hearing in Moore County, NAACP Moore County Chapter President O'Linda D. Watkins sent a letter to the Moore BOE and its Director setting forth what the NAACP had learned about voter removals in Moore County and protesting that the removals violated the NVRA and state law. Watkins Dec. ¶17 & Ex. C. Ms. Watkins asked the Moore BOE to dismiss the challenges that had been filed against approximately 400 voters based on returned mass mailings. *Id.* Ms. Watkins received no response. *Id.* ¶18.

On October 17, 2016, North Carolina NAACP President Rev. Dr. William J. Barber, II sent a letter to the SBOE setting forth what the NAACP had learned about

---

[2] A small number of challenges were rejected when the forwarding address printed on the returned mail by the U.S. Postal Service showed the voter had moved to a different location in the same precinct. Bonds Dec. Ex. F. However, it appears that when the forwarding address showed that the voters had moved to a different precinct but in the same county, so that the voter should have retained eligibility to vote in that county, the BOE nonetheless found probable cause that the voters were ineligible. *Id.*

Case 1:16-cv-01274-LCB-JLW   Document 21-1   Filed 10/31/16   Page 16 of 34

voter removals in Beaufort, Moore, and Cumberland Counties and protesting that the removals violated the NVRA and state law.  Barber Dec. ¶¶15-16 & Ex. A.  Rev. Dr. Barber requested that the SBOE instruct all county BOEs to cease removal of voters from the rolls based on returned mail without complying with the NVRA.  *Id.*  In response, the SBOE claimed that the cancellations do not constitute systemic removals as prohibited within 90 days of the election under 52 U.S.C. §20507(c)(2)(A) but did not address the violations of §20507(d).  Barber Dec. ¶17 & Ex. B.

On October 22, 2016, Rev. Dr. Barber sent another letter to Defendant Kim Westbrook Strach, Executive Director of the SBOE, elaborating on the NAACP's concerns.  Barber Dec. ¶¶18-19 & Ex. C.  The SBOE responded on October 27, 2016, confirming that thousands of voters have been challenged in the past three months on the basis of returned mail but asserting—wrongly—that the resulting purges do not violate the NVRA or state law.  *Id.* ¶21 & Ex. E.

## ARGUMENT

### A.  Plaintiffs Are Entitled to Immediate Injunctive Relief.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

1. **Plaintiffs Have an Overwhelming Likelihood of Success on the Merits of Their Claims.**

   a. **Defendants' Challenge and Purge Procedures Violate the NVRA's Prohibition on Removal of Registered Voters Without Adequate Notice and a Two-Year Waiting Period.**

The NVRA "provides an exhaustive list of circumstances justifying removal [from voter registration rolls]: 'criminal conviction or mental incapacity as provided by state law, the death of the registrant, or . . . a change of the registrant's residence.'" *A. Philip Randolph Inst. v. Husted*, ___ F.3d ___, 2016 WL 5328160, at *4 (6th Cir. Sept. 23, 2016) (quoting *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 376 (6th Cir. 2008)).

With respect to a change in residence, the NVRA provides that "[a] State *shall not* remove the name of a registrant from the official list of eligible voters in elections for Federal office . . . *unless*" the registrant has confirmed a change of residence in writing (a circumstance not at issue in this case) or:

> the registrant . . .
>
> (B)(i) has failed to respond to a notice described in [§20507(d)(2)]; *and*
>
> (ii) has not voted or appeared to vote (and, if necessary, correct the registrant's record of the registrant's address) in an election during the period *beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.*

52 U.S.C. §20507(d)(1) (emphases added); *see U.S. Student Ass'n Found.*, 546 F.3d at 381 (explaining 52 U.S.C. §20507 "limits the methods which a state may use to remove individuals from its voting rolls and is meant to ensure that eligible voters are not disenfranchised by improper removal").

Thus, in order to be removed from voter rolls based on a change of residence (absent written notification by a voter himself), a voter must *both* fail to respond to a notice that meets certain statutory requirements (as set forth in further detail below), *and then* fail to vote in two subsequent federal election cycles (which is at least a two-year period, if, for example, the notice is sent just before a qualifying election). *See generally U.S. Student Ass'n Found.*, 546 F.3d at 381 ("A simple reading of this statute reveals exactly whom this statute protects and from what: States may not remove 'registrants' from an official list of eligible voters based on a change in residence unless certain conditions have been met.").

Here, even if the mailings that were returned as undeliverable and presented to the county BOEs *had* met the NVRA's notice requirements (which, as explained below, they did not), the counties violated and continue to violate federal law by removing challenged voters from the rolls immediately, without waiting even one federal election cycle, much less two. On this basis alone, the unlawful removals must be enjoined and remedied. 52 U.S.C. §20507(d)(1).[3]

Moreover, the returned mailings on which the county BOEs relied for cancellation failed to comply with the formal notice requirements of §20507(d)(2). The only type of

_____

[3] Indeed, the State BOE itself has in other contexts acknowledged that removals based on change-of-address information must be deferred for two federal election cycles. *See* Taylor Dec., Ex. E at 2 (North Carolina Board of Elections Numbered Memo 2014-5, noting that certain voters might be removed from the eligibility list for "failure to respond to a confirmation mailing and were made *inactive* and then remained *inactive* for two federal election periods") (emphasis in original).

notice that can lead to registration cancellation for change of address is notice via "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address." The notice must explain the following:

> (A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

> (B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

52 U.S.C. §20507(d)(2).

While Plaintiffs have not yet been able to obtain all mailings that were submitted to support the recent challenges, those that Plaintiffs have reviewed do not come close to meeting the requirements of §20507(d)(2). For example, the challenges submitted in Moore County were based on returned envelopes marked "*DO NOT FORWARD*." Watkins Dec. ¶11 & Ex. B (emphasis added). That alone renders the mailings insufficient to comply with §20507(d)(2)'s requirement that notice include a postage prepaid and pre-addressed return card, sent by *forwardable* mail, before the two-cycle waiting period is even triggered.

Moreover, even aside from the defective process used by the counties, the challenges were fatally flawed from the outset because their basis was illegal under the

NVRA.  As the SBOE has acknowledged, Barber Dec. Ex. E at 1-2, the challenges were based on returned mail, which in some cases may have shown that a voter moved, but did not provide evidence that a voter had moved *out of the county* in which they originally registered.  *E.g.*, Watkins Dec. Ex. B (only box checked on more than 400 Moore County challenge forms was non-residency in precinct); Bonds Dec. Ex. B (only boxes checked on Beaufort County challenge forms were non-residency in the precinct and non-residency in the municipality); Bonds Dec. Ex. F (Cumberland County Board of Elections Order as to Probable Cause p. 2 (9/30/16)) ("Chairman Baker announced that the ground for these challenges was that the voters *did not live in the precincts* in which they were registered or death. (G.S. §163-85(c)(3))" (emphasis added)).[4]  But the NVRA does not permit any removal of voter registrations based upon change of address, regardless of the procedural mechanisms followed, for any reason other than moving *out of the county.*  Thus, these registration cancellations violate the NVRA's express protection of the right of individuals who have moved within the same county to cast ballots that will be counted, regardless of whether they have updated their registration. *See* 52 U.S.C. §20507(e), (f).

On these grounds alone, Plaintiffs' claims are likely to succeed.

---

[4] This lawsuit does not challenge removals on the basis of death of the voter.

**b. Defendants' Challenge and Purge Procedures Violate the NVRA's Prohibition on Systematic Removal Procedures Within 90 Days of an Election.**

The NVRA also prohibits the use of change-of-address information to remove voters from registration lists in the 90 days preceding an election. Specifically, the NVRA mandates that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. §20507(c)(2)(A). The 90-day window, sometimes called a "quiet period," reflects Congress's determination that "using change-of-address information to purge voter rolls less than 90 days before an election creates an unacceptable risk that eligible voters will be denied the right to vote." *Montana Democratic Party v. Eaton*, 581 F.Supp.2d 1077, 1081 (D. Mont. 2008); *see also Arcia v. Fla. Sec. of State*, 772 F.3d 1335, 1346 (11th Cir. 2014) ("Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote."). The statute lays out some exceptions to its 90-day rule, but the exceptions do not include removals based on change of address. *Id.* §20507(c)(2)(B).

The 90-day quiet period serves as a fundamental protection against possible disfranchisement in the lead-up to an election. One of the NVRA's core purposes is to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. §20501(b)(1); *see also* 52 U.S.C. §20501(a)(2) ("[I]t is the duty of the Federal, State, and local governments to promote the

exercise of [the fundamental] right [of citizens to vote].").  By requiring states to complete their purging programs prior to the 90-day window, Congress sought to prevent eligible voters from being disqualified without sufficient time to remedy a wrongful removal, and to prevent large-scale removals when election officials are at their busiest, the likelihood of error is at its highest, and the time and resources to correct errors are at their lowest.  *See Arcia*, 772 F.3d at 1346 (no systematic removals in 90 days before election "because that is when the risk of disenfranchising eligible voters is the greatest"); Cole Dec. ¶11 (Director of Beaufort CBOE stating at Oct. 14, 2016 hearing that challenges are occurring at "a bad time of the year" and "if this had happened in July we wouldn't have had a problem at all").

The unlawful implementation of North Carolina's voter challenge statute, as previously described, is the type of state program proscribed within 90 days of an election. Although challenges are initiated by individual citizens, state law establishes the challenge mechanism and procedures including the applicable evidentiary thresholds, N.C.G.S. §163-85, 163-86, and government officials decide whether to hold prima facie and formal hearings, *id.* §163-85(d)-(e), conduct those hearings, *id.* §163-85(d), 163-86; and, perhaps most importantly, decide whether to remove voters from the rolls, *id.* §§163-86(c)-(d).  Indeed, the challenging citizen is not even required to appear at the formal hearing at which a cancellation decision is made.  As such, Defendants' actions constitute a state program to remove the names of ineligible voters from voter registration

rolls, within the meaning of §20507(c)(2)(A). *See generally Arcia*, 772 F.3d at 1344

("[T]he phrase 'any program' suggests that the 90 Day Provision has a broad meaning.").

In many ways, this case is remarkably like *Montana Democratic Party v. Eaton*.

As here, *Eaton* involved private parties making use of state procedures to challenge

voters' eligibility on the basis of change-of-address information in the 90 days before an

election. 581 F.Supp.2d at 1078-80. The court focused on the State's response to private

party challenges to determine whether it had violated the NVRA, noting that it was "not

clear whether Secretary of State['s] response to the voter challenges at issue here is

illegal." *Id.* at 1082. While the *Eaton* court determined that the plaintiffs there had not

demonstrated that the state's actions violated federal law, *id.* at 1080, the court noted: "If

the State's procedure for evaluating voter challenges allows a county election official to

conclude that any voter Eaton has targeted on the basis of change-of-address information

cannot vote, or that the elector has to prove anything before he or she is allowed to vote,

*the State would then be in clear violation of federal law*." *Id.* at 1083 (emphasis added).[5]

_____

[5] In *Eaton* the court also noted that that the Montana Secretary of State had ordered counties not to send challenge letters to voters informing them that their eligibility had been challenged. 581 F.Supp.2d at 1082 n.3. Thus, not only did the State stop short of removing voters from its registration lists, but it refused to let its procedures be used in any way to discourage voters from casting ballots. Here, by contrast, Defendants have perpetuated these last-minute citizen challenges by holding preliminary hearings on these challenges, sending out notice letters informing voters that their eligibility has been challenged, conducting formal hearings on these challenges, and in the vast majority of cases, sustaining these challenges and purging voters from the voter rolls. Bonds Dec. Ex. E & F (Beaufort); Watkins Dec. ¶¶8, 13-14, 16 (Moore); Bonds Dec. Ex. F (Cumberland).

Here, by establishing a procedure that allows private parties to file *en masse* challenges and cancelling registrations on the basis of change-of-address information in the 90 days before an election, Defendants have done precisely what the court in *Eaton* said would violate §20507(c)(2)(A).

Similarly, there is no question but that these challenges constitute an effort "to systematically remove the names of ineligible voters," as contemplated by §20507(c)(2)(A). The challenges are part of a concerted program to affirmatively identify large numbers of ineligible voters. *See* Watkins Dec. ¶¶11-2; Barber Dec. Ex. E; Bonds Dec. Ex. F. The challenged voters are identified on the basis of mass mailings, Barber Dec. Ex. E, and the challenges are filed in large batches of up to several hundred at a time. Watkins Dec. ¶11 & Ex. B; Bonds Dec. Ex. F. In most cases, the challenges are based solely on returned mail and the challengers present no individualized information about the challenged voters. *See* Watkins Dec. ¶11; Barber Ex. E; *see also Arcia*, 772 F.3d at 1346 (distinguishing "systematic[]" programs from "removals based on individualized information"). In *Arcia*, the Eleventh Circuit explained that use of "a mass computerized data-matching process . . . , followed by the mailing of notices" is exactly the type of systematic program prohibited by §20507(c)(2)(A). 772 F.3d at 1344. Indeed, the legislative history §20507(c)(2)(A) confirms that Congress intended mass mailings to be covered by the 90-day prohibition. H. Rep. 103-9 (Feb. 2, 1993) ("This requirement applies to the State outreach activity such as a mailing . . . and requires that such activity be completed by the 90-day deadline."); S. Rep. 103-6 (Feb. 25, 1993).

Here, a handful of parties, in some cases acting on information and assistance provided by the Voter Integrity Project ("VIP"), have initiated *en masse* challenges to registered voters, and the State has facilitated these challenge proceedings beyond the 90th day before Election Day, which was August 10. Taylor Dec. Ex. K, L, O, P. In Cumberland County, for instance, a probable cause determination was made for thousands of registered voters at a single hearing. Bonds Dec., Ex. F. Similarly, in Moore County, nearly 400 registered voters were removed from the rolls at a single hearing. Watkins Dec. ¶¶14, 16. In Beaufort County, 138 challenges were similarly processed in bulk at hearings on October 24 and October 29, just two weeks before Election Day.[6]

In the October 27, 2016 letter to Rev. Dr. Barber, the State BOE contended that cancelling voter registrations through the State's challenge process is not barred by the NVRA because the challenge process is "individualized." Barber Dec., Ex. E. But the facts here – where voters were removed based on returned mass mailings and thousands

---

[6] The result of the October 24, 2016 hearing demonstrates why systematic challenges such as these within the 90 days before an election are proscribed. In Beaufort County, three local residents took it upon themselves to assist some voters whose registration has been challenged. Ward Decl ¶¶3-11. They were able to contact some voters scheduled for the October 24 hearing, notify them that they were being challenged (a fact of which many were unaware), and assist them in providing evidence of their voter eligibility. Ward Dec. ¶¶6-10; Bonds Dec. Ex. D. Unfortunately, not all challenged voters have received such assistance and the experience in Beaufort County raises serious questions regarding how many of the nearly 400 voters recently removed from the rolls in Moore County, for example, are in fact eligible voters who did not know their registration had been challenged or were confused by or unable to participate in the challenge process. Disenfranchisement of eligible voters is contrary to the purpose of the NVRA. |*See generally* 53 U.S.C. §20501(b) (NVRA purposes).

of voters were removed at a single hearing, Bonds Dec., Ex. F – belie any argument that these removals are "individualized."

It is unclear how many North Carolina counties have seen systematic efforts such as this within the NVRA's 90-day window. But it is indisputable that large-scale efforts to remove voters on the basis of a change of residency have resulted in thousands of North Carolina voters being removed from the rolls with the NVRA's 90-day window. As such, Plaintiffs have established probable success on the merits of this claim.

> **2. Absent Immediate Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm, Enforcement of the NVRA Serves the Public Interest, and the Balance of Hardships Favors Issuance of an Injunction.**

All remaining equitable considerations—irreparable harm, the public interest, and the balance of the hardships—favor the issuance of a TRO.

"Courts routinely deem restrictions on fundamental voting rights," such as those at issue here, "irreparable injury." *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 247 (4th Cir. 2014) (citing *Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir.2012)); *see also Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir.1986)); *City of Greensboro v. Guilford County Bd. of Elections*, 120 F.Supp.3d 479, 489 (M.D.N.C. 2015). Plaintiffs' individual declarations attest to the paramount importance of voting. *See* Hardison Dec. ¶¶6-7; Cox Dec. ¶15; Arthur Dec. ¶¶12-13; Brower Dec. ¶11. "It is beyond dispute that voting is of the most fundamental significance under our constitutional structure," and that "no right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *North*

*Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016) (internal quotes, citation, and brackets omitted).

North Carolina's processes *place significant burdens on challenged voters*. Most challenged voters will never even learn their registrations have been challenged because notice is sent only to the same address from which mail was previously returned. If a voter does learn of a challenge, the voter must take time away from other responsibilities to attend a hearing set at a time convenient for the BOEs, not the voter, and find transportation to travel what may be many miles to the hearing. Cole Dec. ¶10. The voter's alternative is to find someone else who can attend the hearing and submit an affidavit on the voter's behalf.

Those voters whose registrations have been cancelled because they did not receive notice or because they could not attend the hearing will not appear on the list of registered voters at their voting place and, therefore, will not be allowed to cast regular ballots. Instead, they will be required to stand in a separate line and attempt to complete the complicated steps required to submit a provisional ballot. N.C.G.S. §163-166.11.

Worse, voters whose registrations have been cancelled will likely be prevented from casting even provisional ballots. Voters are permitted to cast provisional ballots only if they execute a written affirmation "stating that the individual is a registered voter in the jurisdiction . . . and is eligible to vote in that election." N.C.G.S. §163-166.11(2). However, a voter whose registration has been cancelled likely will be unable to execute

such an affirmation because he or she is no longer "a registered voter in the jurisdiction." Therefore, many affected voters will be unable to cast ballots at all.[7]

And even if some affected voters are able to cast provisional ballots, many of those ballots will likely not be counted. Under prior SBOE directives, provisional ballots are counted only if the county BOE determines that the voter was eligible to vote, including that the voter was registered in the county. Taylor Dec. Ex. D & F.[8] Thus, it is likely that any provisional ballots cast by voters whose registration has been cancelled will be discarded. *See also* Taylor Dec. ¶4 & Ex. A (in 2014, over half of provisional ballots in North Carolina election were rejected).[9] This harm is imminent because the next election will take place on November 8, 2016.

Finally, many voters who learn of the challenges against them will be deterred from voting, even if their registration is preserved. As Grace Hardison, a 100-year-old

---

[7] Those voters who had moved within the county without notifying the county board of the change of address would be permitted to cast ballots if their voter registrations had not been cancelled. N.C.G.S. §163-182.15(e); *see also* Taylor Dec. Ex. D at 7 & E at 1-2.

[8] The BOE directive from the 2016 primary election instructed county BOEs to research the eligibility of voters who cast provisional ballots because their names did not appear on the voter lists, and provides for the ballot to be counted only if it is determined "that she is registered or that she attempted to register before the voter registration deadline." Taylor Dec. Ex. D at 8.

[9] The North Carolina statute refers to a "challenged ballot" that is to be counted if a challenged voter is eligible to vote "as if it were a provisional official ballot under the provisions of GS 163-166.11(4)." N.C.G.S. §163-90.2(a). But that provision appears to apply only to ballots cast by voters whose eligibility is challenged on Election Day. *See* N.C.G.S. §163-88.1(a). Even if it did apply to Plaintiffs, the provision states only that challenged ballots should be treated like provisional ballots, which likely will not be counted for the reasons explained above.

resident of Beaufort County, explains, the uncertainty caused by the challenge, as well as the feeling of having been targeted for removal, will likely undermine many challenged voters' confidence that they will be able to vote and that their votes will be counted. Hardison Dec. ¶¶5-7, 9; *see also* Brower Dec. ¶12; Arthur Dec. ¶14.

"By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" *League of Woman Voters*, 769 F.3d at 247-48 (quoting *Husted* , 697 F.3d at 437); *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."). As the D.C. Circuit recently held:

> the public interest further favors a preliminary injunction [where], absent an injunction, there is a substantial risk that citizens will be disenfranchised in the present federal election cycle. The public has a "strong interest in exercising the fundamental political right to vote," *Purcell v. Gonzalez*, 549 U.S. 1, 4 . . . (2006) (internal quotation marks omitted), a right that is "'preservative of all rights,'" *Dunn v. Blumstein*, 405 U.S. 330, 336, . . . (1972) (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 . . . (1964)), and "of the most fundamental significance under our constitutional structure," *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 . . . (1979).

*League of Women Voters of United States v. Newby*, __ F.3d __, 2016 WL 5349779, at *8 (D.C. Cir. Sept. 26, 2016). Here, the issuance of injunctive relief will prevent the unlawful disenfranchisement of hundreds of North Carolinians, which is clearly in the public interest.

Finally, the balance of hardships favors the Plaintiffs. Even though "North Carolina [may] have little time to implement the relief," the balance of hardships tips in

favor of plaintiffs where, as here, certain practices simply need to be "reviv[ed]," such as restoring unlawfully disenfranchised voters to the state's eligible voter list. *League of Women Voters*, 769 F.3d at 248. Additionally, "[t]he balance of hardships does not weigh in favor of the defendants" where an injunction "will simply compel the defendants to comply with their responsibilities under the NVRA and, thus, will prevent them from denying the public of a statutory right." *Project Vote/Voting for Am., Inc. v. Long*, 813 F.Supp.2d 738, 744 (E.D. Va. 2011).

### B. Injunctive Relief Should Be Framed to Ensure Voters' Ballots Are Counted

Any TRO entered by this Court should enjoin Defendants and their officers, agents, employees, attorneys, and all persons who are in active concert or participation with them from the following unlawful conduct: (1) cancelling the registration of voters through the challenge procedure set forth in N.C.G.S. §163-85 and §163-86, when those challenges are based on change of residency and the State has neither received written confirmation from the voter of a change in residence outside of the county, nor complied with the NVRA's notice requirement and two-election cycle waiting period; (2) using the challenge procedure set forth in N.C.G.S. §163-85 and §163-86 to remove voters from the rolls based on change of residency information in the 90 days preceding a federal election; and (3) holding hearings or taking any other actions to process challenges filed under those provisions in the circumstances identified.

In addition, because hundreds or possibly thousands of voter registrations have been unlawfully cancelled in the past few months, the TRO should require Defendants to

take all steps necessary to restore the voter registrations cancelled through illegal application of the challenge procedure set forth in N.C.G.S. §163-85 and §163-86, so that those voters can cast regular ballots in the upcoming November 8, 2016 election. Plaintiffs understand that Defendants maintain a statewide, electronic voter database, so it should be possible to quickly and efficiently restore these voters' registrations.

The TRO should further protect the individuals who are restored to the voter registration rolls and all those who were unlawfully challenged pursuant to N.C.G.S. §163-85 and §163-86 by enjoining Defendants from preventing or otherwise interfering with the affected individuals' right to vote and requiring Defendants to issue directives and take all other measures to ensure that any wrongfully purged voters can cast regular ballots on or before November 8, 2016 and in future elections, including by prohibiting any same-day challenges to such voters under N.C.G.S. §163-87 if they appear to vote in person on November 8, 2016.

Because some voters whose registrations have been cancelled may already have cast provisional, challenge, or absentee ballots for the November 8 election, the TRO should require that such ballots be treated as if the voters who cast them were registered in their respective counties on the date the votes were cast, and that their votes be counted accordingly. And because some voters may already have requested but been denied absentee ballots on the ground that they are not registered in the county, the TRO should require that such voters receive and be allowed to cast absentee ballots and have those votes counted, unless the voter voluntarily chooses to vote in person at the polls.

Finally, because many affected voters may have been notified that their registrations were cancelled, the TRO should direct Defendants to issue directives and take all other measures necessary to ensure that such voters are notified that their registrations have been restored and that they will be able to cast regular ballots in upcoming elections. Likewise, because many affected voters whose challenges were dismissed or withdrawn were never so informed, the TRO should direct Defendants to issue directives and take all other measures necessary to ensure that such voters are notified that their registrations are valid and that they will be able to cast regular ballots in upcoming elections, including on November 8, 2016.

## CONCLUSION

For the reasons discussed, this Court should grant the requested TRO.


Dated:          October 31, 2016

> Respectfully submitted,
>
> /s/ Stacey M. Leyton
> Stacey M. Leyton (CA SBN 203827)
> Peder J. Thoreen (CA SBN 217081)
> Eric P. Brown (CA SBN 284245)
> Connie K. Chan (CA SBN 284230)
> ALTSHULER BERZON LLP
> 177 Post Street, Suite 300
> San Francisco, CA 94108
> Telephone: (415) 421-7151
> Facsimile: (415) 362-8064
> E-mail:        sleyton@altber.com
>                pthoreen@altber.com
>                ebrown@altber.com
>                cchan@altber.com

/s/ Penda D. Hair
Penda D. Hair (DC SBN 335133)
Leah J. Kang (DC SBN 1017035)
Caitlin A. Swain (VA SBN 84515)
FORWARD JUSTICE
1401 New York Avenue, NW, Suite 1225
Washington, DC 20005
Telephone: (202) 256-1976
Email: phair@forwardjustice.org
        lkang@forwardjustice.org
        cswain@forwardjustice.org

/s/ Irving Joyner
Irving Joyner (NC SBN 7830)
P.O. Box 374
Cary, NC 27512
Telephone: (919) 319-8353
Fax: (919) 530-6339
Email: ijoyner@nccu.edu

/s/ Mary Joyce Carlson
Mary Joyce Carlson (DC SBN 987939)
1101 New York Avenue NW
Washington DC 20008
Telephone: (202) 230-4096
Fax: (202) 408-4649
Email: Carlsonmjj@yahoo.com