IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA STATE CONFERENCE )
OF THE NAACP, MOORE COUNTY )
BRANCH OF THE NAACP, JAMES )
EDWARD ARTHUR, SR., JAMES MICHAEL )
BROWER, GRACE BELL HARDISON, and )
JAMES L. COX, )
)
    Plaintiffs, )
)
  v. )     1:16CV1274
)
THE NORTH CAROLINA STATE BOARD )
OF ELECTIONS, A. GRANT WHITNEY, JR., )
in his official capacity as Chairman of the State )
Board of Elections, RHONDA K. AMOROSO, )
in her official capacity as Secretary of the State )
Board of Elections, KIM WESTBROOK )
STRACH, in her official capacity as Executive )
Director of the State Board of Elections, )
JOSHUA D. MALCOLM, in his official capacity )
as Member of the State Board of Elections, )
JAMES BAKER, in his official capacity as )
Member of the State Board of Elections, MAJA )
KRICKER, in her official capacity as Member of )
the State Board of Elections, the BEAUFORT )
COUNTY BOARD OF ELECTIONS, JAY )
MCROY, in his official capacity as Chairman of )
the Beaufort County Board of Elections, JOHN )
B. TATE, III, in his official capacity as Secretary )
of the Beaufort County Board of Elections, )
THOMAS S. PAYNE, II, in his official capacity )
as Member of the Beaufort County Board of )
Elections, KELLIE HARRIS HOPKINS, in her )
official capacity as Director of the Beaufort )
County Board of Elections, the MOORE )
COUNTY BOARD OF ELECTIONS, SUSAN )
T. ADAMS, in her official capacity as Chairman )
of the Moore County Board of Elections, )
CAROLYN M. MCDERMOTT, in her official )
capacity as Secretary of the Moore County Board )

of Elections, WILLIAM R. PARKE, in his )
official capacity as Member of the Moore County )
Board of Elections, GLENDA M. )
CLENDENIN, in her official capacity as )
Director of the Moore County Board of )
Elections, the CUMBERLAND COUNTY )
BOARD OF ELECTIONS, JAMES H. BAKER,)
in his official capacity as Chairperson of the )
Cumberland County Board of Elections, )
ROBERT KEVIN HIGHT, in his official )
capacity as Secretary of the Cumberland County )
Board of Elections, HARVEY RAYNOR III, in )
his official capacity as Member of the )
Cumberland County Board of Elections, and )
TERRI ROBERTSON, in her official capacity as )
Director of the Cumberland County Board of )
Elections, )
)
                           Defendants. )

## MEMORANDUM OPINION

Loretta C. Biggs, District Judge.

This matter comes before the Court for hearing on Plaintiffs' Application for a Temporary Restraining Order ("TRO") and pursuant to the Order entered by this Court on October 31, 2016 setting this matter for hearing.

Plaintiffs, the North Carolina State Conference of the NAACP, the Moore County Branch of the NAACP (collectively the "NAACP"), James E. Arthur, Sr., James M. Brower, Grace B. Hardison, and James L. Cox ("Individual Plaintiffs"), commenced this action seeking declaratory and immediate injunctive relief, alleging, among other things, violations of Section 8 of the National Voter Registration Act, ("NVRA" or the "Act"), 52 U.S.C. § 20507(a).[1]

---

[1] Plaintiffs also assert violations of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment. Only the NVRA violations are the subject of Plaintiffs' TRO.

Named as Defendants are the North Carolina State Board of Elections, Kim W. Strach in her official capacity as the Executive Director of the State Board of Elections, its Officers and Members, (collectively "State Board"); the Beaufort County Board of Elections, its Director Kellie H. Hopkins, and its Officers and Members (collectively "Beaufort County Board"); the Moore County Board of Elections, its Director Glenda M. Clendenin, and its Officers and Members (collectively "Moore County Board"); and the Cumberland County Board of Elections, its Director Terri Robertson, and its Officers and Members (collectively "Cumberland County Board"). The Defendant County Boards shall be referred to herein as "County Boards." For the reasons that follow, Plaintiffs' motion is granted in part.

## I.  BACKGROUND

Plaintiffs' Complaint alleges that in recent weeks and months boards of elections in at least three North Carolina counties, Beaufort, Moore, and Cumberland, and possibly others, have canceled thousands of voter registrations for changes of residency on the basis of single mailings returned as undeliverable. (ECF No. 1 ¶ 3.) Further, according to the Complaint, "[i]n many cases, voters purged by [the County Boards] still reside at the addresses where they are registered to vote, or have moved within the county and remain eligible to vote there." (*Id.*)

Specifically, in Beaufort County four individuals challenged approximately 138 registered voters based on correspondence that was sent to each of the voters and returned undeliverable. (ECF No. 21-1 at 6.) Of the 138 registered voters challenged, records reveal that 59 were active voters, including 19 who voted last year. (*Id.*) Ultimately, as a result of these challenges, 63 voters were purged from the voter rolls by the Beaufort County Board.

3

(ECF No. 39-1 ¶ 8; Tr. at 52.)  Among those challenged in Beaufort County were Individual Plaintiffs, Arthur, Hardison, and Cox.  (ECF No. 8 ¶ 11; ECF No. 10 ¶ 5; ECF No. 11 ¶¶ 8.)  Plaintiff Arthur has lived in Beaufort County all of his life, moved from his residence in 2013 to a nursing home within the county, and has voted in at least fourteen elections, voting last in November 2013.  (ECF No. 8 ¶¶ 2–4, 9.)  Though the Beaufort County Board was made aware that he was in the nursing home, it purged his name from the voter registration rolls.  (*Id.* ¶ 11.)  Plaintiff Hardison, a 100-year-old woman, has lived in Beaufort County all of her life, does not have a mailbox at her home, and her mailing address is a PO Box.  (ECF No. 10 ¶¶ 1–3.)  The address on her voter registration application is her physical home address.  (*Id.* ¶ 2.)  She last voted in 2015 and only learned that her voter registration had been challenged through her nephew.  (*Id.* ¶¶ 4–5.)  She was forced to provide evidence to the individual challenging her voter registration to prevent her name from being removed from the voter rolls.  (*Id.* ¶ 8.)  Plaintiff Cox, another lifelong resident of Beaufort County, last voted in the June 2016 Primary, and learned through a friend that his voter registration was being challenged.  (ECF No. 11 ¶¶ 2, 6, 8.)  Cox completed a form to provide the Beaufort County Board at the October 29, 2016 hearing "to make sure that [his] name was not removed from the voter rolls."  (*Id.* ¶¶ 10–13.)

In Moore County, one individual challenged approximately 400 registered voters based on a return postcard marked undeliverable.  (ECF No. 7 ¶ 11.)  The voter challenge forms are dated either May 6, July 1 or July 12, 2016.  (*Id.*)  "[A] dozen or less of the challenges were dismissed or otherwise taken off the challenge list, at least for the time being," and "the remaining individuals on the challenge list were removed from the voter rolls" by the Moore

4

County Board. (*Id.* ¶ 16.) Plaintiff Brower was among those individuals whose voter registration was challenged in Moore County. (ECF No. 9 ¶ 8.) He learned that his voter registration status had been challenged after receiving a phone call from a friend. (*Id.*) Brower went to the Moore County Board's office because he feared he was in danger of being removed from the voter rolls. (*Id.* ¶ 9.) He provided his current address and his name was taken off the challenge list. (*Id.*) Ultimately, 374 of the challenged voters were purged from the rolls in Moore County. (Tr. at 70.)

In Cumberland County, one individual challenged the voter registration of approximately 4,000 Cumberland County voters. (ECF No. 15-6 at 1–2; *see also* ECF No. 5-5 at 1.) The challenges were made after mailings by this private individual were returned undeliverable. (ECF No. 5 ¶ 24.)

Upon learning of these events, the NAACP sent a letter to the State Board, asserting that the NVRA prohibited the "systematic removal[ ]" of these voters from the registration rolls. (ECF No. 5-1 at 1.) The NAACP requested that all county boards of elections cease removing voters from their rolls based on one piece of returned mail. (*Id.* at 4; ECF No. 5-3 at 7.)

The State Board, however, defends these mass cancellations on the ground that state laws purportedly allow private individual challenges to voter registrations based on evidence that voters have moved out of the precinct, which may include a returned mailing. (ECF No. 5-5 at 2.) In a letter dated October 27, 2016, Defendant Strach of the State Board stated that the Board was aware that "private citizens have challenged roughly 4,500 voters spread across Beaufort, Cumberland, and Moore counties." (*Id.*) The State Board argues that the voter

5

cancellations do not qualify as a systematic removal of voters proscribed within 90 days of an election under Section 8 of the NVRA. (ECF No. 5-2 at 2 ("To the extent your correspondence raises concerns over removals following individualized determinations entered following challenge proceedings under Article 8 of Chapter 163,[2] such removals are not part of North Carolina's systematic list maintenance program and are not, therefore, of the type barred under the NVRA").)

Plaintiffs subsequently filed this action requesting a temporary restraining order and other injunctive relief to prevent further voter registration cancellations and to restore the registration of those that they contend were improperly canceled and removed from the state's voter rolls.

## II. NATIONAL VOTER REGISTRATION ACT

Congress, in 1993, passed the NVRA "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "to protect the integrity of the electoral process," and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012). The provision of the Act that is at issue in this case is Section 8, which addresses a state's removal of individuals from a state's voter rolls. 52 U.S.C. § 20507.

---

[2] North Carolina's voter challenge law was enacted in 1901 and permits any registered voter of a county to challenge the voter eligibility of another person to register, provided that no challenge shall be made within 25 days of a primary, general, or special election. N.C. Gen. Stat. § 163-85(a). State law provides a number of grounds a challenge may be sustained, including, among others, that a person is not a resident of North Carolina, is not a resident of the county in which the person is registered to vote, or is not a resident of the precinct in which the person is registered. § 163-85(b).

Section 8 of the Act "pairs the mandate that states maintain accurate voter rolls with multiple constraints on how the states may go about doing so." *A. Philip Randolph Inst. v. Husted*, --- F.3d ----, 2016 WL 5328160, at *3 (6th Cir. Sept. 23, 2016). In particular, Section 8 of the NVRA provides that "each State shall . . . provide that the name of a registrant *may not* be removed from the official list of eligible voters" unless certain prerequisites are met: (1) "at the request of the registrant;" (2) "as provided by State law, by reason of criminal conviction or mental incapacity;" (3) "death of a registrant;" or (4) "a change in the residence of the registrant." § 20507(a)(3)–(4) (emphasis added).

The Act requires that each state "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)." § 20507(a)(4). Subsection (b) of the Act provides that voter roll maintenance procedures "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965" and "shall not result in the removal of the name of any person from the official list of voters registered to vote in an election . . . by reason of the person's failure to vote" except as specified in subsections (c) and (d). § 20507(b). Subsection (c) of the Act provides that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election . . . any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." § 20507(c)(2)(A). Subsection (d)(1) of the Act provides that "[a] state shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant[:]" (1) confirms in writing that he or she has moved outside the registrar's

7

jurisdiction—*i.e.*, county[3]; or (2) fails to respond to a notice as outlined under subsection (d)(2); and (3) has not voted or appeared to vote in two federal election cycles following receipt of notice. § 20507(d)(1).

## III. LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of temporary restraining orders and preliminary injunctions. Where, as in this case, the opposing parties have notice of the Plaintiffs' motion for a temporary restraining order and have had the opportunity to be present at a hearing on the motion, as well as present evidence, "the court treats the motion as a request for preliminary injunction."[4] *Planned Parenthood of Wis., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 864 (W.D. Wis. 2013); *see U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 284 (4th Cir. 2006) (concluding that the defendant "had a fair opportunity to oppose the injunction and that the district court did not abuse its discretion in electing to enter a preliminary injunction in lieu of a TRO").

A preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power that is only to be employed in the limited circumstances that demand it.

---

[3] In North Carolina, use of the term "jurisdiction" as used in Section 8 of the NVRA refers to county. *See* 52 U.S.C. § 20507(j)(2); N.C. Gen. Stat. § 163-82.1.

[4] On October 29, 2016, Plaintiffs notified the General Counsel for the State Board and a Senior State Deputy Attorney of this impending lawsuit, its temporary restraining order application and a request for a hearing. (ECF No. 21 at 1.) Further, on October 31, 2016, this Court entered an Order setting a hearing for November 2, 2016 at 9:00 a.m., (ECF No. 24), and a follow-up call by the Court's Courtroom Deputy was made to both Plaintiffs' and Defendants' counsel, confirming the parties' receipt of the Court Order scheduling the hearing. In addition, Moore County Board filed a Motion to Dismiss unaccompanied by a brief. (ECF No. 32.) Though this Court's Local Rules require briefing on such motions, (*see* LR 7.3(a)), the Court informed counsel for Moore County Board that it would consider the Motion to Dismiss given the time constraints presented in this matter. Counsel for Moore County Board, however, withdrew its motion to dismiss in open court during the hearing.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Whether to grant a preliminary injunction is in the sound discretion of the court. *Id.*; *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). Courts generally employ preliminary injunctions for the limited purpose of preserving the status quo during the course of litigation in order to prevent irreparable harm and to preserve the ability of the court to render meaningful relief on the merits. *In re Microsoft Litig.*, 333 F.3d at 525. The Fourth Circuit has defined the status quo as the "last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)). The party seeking a preliminary injunction bears the burden of justifying such relief. *Wagner v. Bd. of Educ.*, 335 F.3d 297, 302 (4th Cir. 2003).

To prevail on a motion for preliminary injunction, a party must establish that (1) the party is likely to succeed on the merits, (2) the party is likely to suffer irreparable harm without preliminary injunctive relief, (3) the balance of the equities tips in the party's favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "[A] clear showing" of likelihood of success on the merits and irreparable harm is required in addition to satisfying the other factors before a preliminary injunction can be entered. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

Before turning to the merits of Plaintiffs' alleged violations, the Court must first examine threshold issues raised by the State Board at the hearing on the preliminary injunction.

9

The State Board advanced two arguments related to its theory that it is not a proper party to this action. First, the State Board argues that the NVRA applies to state action, not the individual challenge process under North Carolina law. (Tr. at 39–40.) Although the State Board is correct that individuals initiated the challenge process at issue, these individuals cannot administer hearings related to the challenges, make findings of probable cause, and actually remove a voter from the voter rolls, which is the injury alleged here. Thus, the challenges would have no effect on the voter if such challenges were not processed and sustained by the County Boards. *See Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1083 (D. Mont. 2008) ("[I]f the State's procedure for evaluating voter challenges allows a county election official to conclude that any voter [the challenger] has targeted on the basis of change-of-address information cannot vote, or that the elector has to prove anything before he or she is allowed to vote, the State would then be in clear violation of federal law.").

Nor is the Court persuaded by the State Board's second argument that it is not a proper party to this action because the County Boards, rather than the State Board, removed these individuals from the voter rolls. (Tr. at 30–31.) North Carolina law grants the State Board general supervision over all elections in North Carolina, including the authority to make rules and regulations with respect to those elections. N.C. Gen. Stat. § 163-22. In addition, the NVRA directs every state to identify a chief election officer to ensure that the state complies with the NVRA, *see* 52 U.S.C. § 20509, and North Carolina places that responsibility with Defendant Strach, as the Executive Director of the State Board, *see* N.C. Gen. Stat. § 163-82.2. As stated by counsel for Strach during the hearing, "if Your Honor was to find a violation of the NVRA, . . . Your Honor's ruling would be implemented by Ms. Strach." (Tr. at 31.)

The Court therefore rejects both arguments by the State Board and will proceed to examine the merits of Plaintiffs' claims.

### 1. NVRA's Prohibition on Systematic Removal of Voters from Rolls within 90 days of an Election

Plaintiffs assert that the County Boards have systematically removed registered voters in Beaufort, Moore, and Cumberland Counties, among others counties, in September and October of this year, violating the NVRA's prohibition against such removals within 90 days of a General Election. (ECF No. 21-1 at 17–22.) In particular, Plaintiffs argue that in each of these counties, County Boards improperly used change-of-address information submitted to them *en masse* by a few individuals challenging voters' eligibility under North Carolina law. (*See* ECF No. 21-1 at 20.)

The Eleventh Circuit observed that "the 90 day Provision is designed to carefully balance . . . competing purposes in the NRVA . . . by limiting its reach to programs that 'systematically' remove voters from the voter rolls," but permitting removals "based on individualized information at any time." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Individualized removals do not present the same risks as systematic removals because they are "based on individual correspondence or rigorous individualized inquiry, leading to a smaller chance for mistakes." *Id.* As the United States explains in its Statement

of Interest,[5] Section 8 does not prohibit individualized determinations of a voter's change of residence based on "reliable first-hand evidence specific to that voter." (ECF No. 33 at 5.) In contrast, "Congress decided to be more cautious" with systematic removals, given that "[i]n the final days before an election . . . [e]ligible voters removed . . . will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful balance: [i]t permits systematic removal programs at any time *except* for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest." *Arcia*, 772 F.3d at 1346; *see Eaton*, 581 F. Supp. 2d at 1081 ("using change-of-address information to purge voter rolls less than 90 days before an election creates an unacceptable risk that eligible voters will be denied the right to vote").

Here, there is little question that the County Boards' process of allowing third parties to challenge hundreds and, in Cumberland County, thousands of voters within 90 days before the 2016 General Election constitutes the type of "systematic" removal prohibited by the

---

[5] The United States submitted its Statement of Interest pursuant to 28 U.S.C. § 517, which states that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517. Such guidance is "entitled to a measure of respect." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008).

NVRA.[6]  A very small number of third parties targeted these voters, mailing them correspondence and submitting the correspondence that came back undeliverable to the County Boards as part of their large scale voter challenge efforts.  There is no evidence in the record that these third parties that challenged the voters had any reliable first-hand evidence specific to the voters challenged.  In fact, most of these voters were targeted based on information about their status contained on the State Board's website.[7]  (*See, e.g.*, Tr. at 82, 99.)  These third parties then used North Carolina's challenge procedures provided in N.C. Gen. Stat. § 163-85(a) as a mechanism to have these voters purged from the state's voter rolls.  Specifically, in all three counties, a few individuals[8] submitted mailings marked undeliverable to the County Boards, sometimes in batches up to hundreds at a time.  (*See* ECF No. 7 ¶ 11 & Ex. B; Tr. at 11, 95.)  The Boards then held preliminary hearings as required by North

---

[6] The actual number of voters removed by County Boards within 90 days of the 2016 General Election is not clear on this record.  Within the 90-day window, the Court notes that Beaufort and Moore County Boards removed 63 and 374 voters, respectively.  (Tr. at 52, 70.)  Although the Court does not know the exact number of Cumberland County voters removed within the 90-day window, the Cumberland County Board reviewed approximately 3,500 challenges at the preliminary hearing on September 10 and September 15, 2016,  (Tr. at 76), and there is evidence that probable cause was found for approximately 3,000 of those voters (*Id.* at 13).  In the past 24 months, 63 voters were removed in Beaufort County, 5,577 in Cumberland County, and 790 in Moore County.  (ECF No. 39-1 ¶ 8.)

[7]  Many of the voters challenged were on the state's inactive list.  (*See* ECF No. 39-1 ¶ 9.)  Being on the inactive list does not mean that a voter is ineligible to vote but may indicate that a voter has not voted in two consecutive federal elections, (ECF No. 5-5 at 1 & n.7).  However, there may be other reasons for a voter ending up on the inactive list. (Tr. at 123.)

[8] As previously noted, in Beaufort County, four individuals challenged approximately 138 registered voters, (ECF No. 21-1 at 6); in Moore County, one individual challenged approximately 400 registered voters, (ECF No. 7 ¶ 11); and in Cumberland County, one individual challenged approximately 4,000 registered voters, (ECF No. 15-6 at 1–2).

Carolina law[9] to evaluate the challenges, and in most cases, the only evidence presented was the one mailing returned and marked undeliverable.[10] (*See* Tr. at 57, 80, 128–29.) Notifying the challenged voter of the preliminary hearings was not required under North Carolina law, nor was it prohibited, however, none of the Boards elected to involve the challenged voters in this part of the process. The sole mailing marked undeliverable served as prima facie evidence, and in these cases, the only evidence that the voter was no longer a resident of the precinct in which he or she registered. *See* N.C. Gen. Stat. § 163-85(e). As such, these mailings provided the sole basis for a finding of probable cause by the County Boards that thousands of voters were not eligible to vote under North Carolina law. (*See* ECF No. 15, Ex. F; Tr. at 12–13, 57, 79–80.) To rebut this finding of probable cause and prevent being removed from the voter rolls, North Carolina law places the burden on the voter who has to provide an affidavit or sworn testimony at a formal hearing set by the County Boards. N.C. Gen. Stat. § 163-86(c)–(d). In this case, many of the affected voters were unaware of this hearing and did not appear, perhaps in large part because the County Boards directed the notice of formal hearing to the same address as the undelivered mailing that supported the challenges. If a challenged voter did not attend the hearing or send someone with an affidavit attesting to that voter's residency, the County Boards canceled the voter registration of the challenged voter, asserting that such

---

[9] § 163-85(d)

[10] The Court recognizes that Moore and even Cumberland County Boards took some steps prior to the preliminary hearing to determine the status of the challenged voters' addresses and that some of the challenges were resolved in favor of the voter at the preliminary hearing. (Tr. at 72, 78.)

cancellation was required by North Carolina law. (*See, e.g.*, ECF No. 7 ¶¶ 13–16; ECF No. 12 ¶ 11; ECF No. 8 ¶ 11; ECF No. 21-1 at 6–11; *see* Tr. at 80.)

Three striking examples of this involve the challenges to Plaintiffs, Arthur and Hardison, and a third eligible voter, Latasha Freeman. Mr. Arthur is a lifelong resident of Beaufort County who had voted as recently as the November 2013 municipal election. (Tr. at 17; ECF No. 8 ¶¶ 2, 9.) At the formal hearing on the challenge to his voter registration, the Beaufort County Board received testimony that Arthur had moved to a nursing home, and the Board knew that the nursing home was within Beaufort County. (ECF No. 16 ¶ 13; Tr. at 18.) Nevertheless, the Board sustained the challenge and canceled his voter registration when he did not attend the hearing. (ECF No. 16 ¶ 13.) Ms. Hardison, who is 100 years old and another lifelong resident of Beaufort County, voted as recently as the 2015 municipal election. (Tr. at 18; ECF No. 10 ¶¶ 1–2, 4.) At the October 14, 2016 probable cause hearing on her challenge, the Board acknowledged that the challenge correspondence was sent to the wrong address. (Tr. at 19.) It was also acknowledged that Ms. Hardison called the Board of Elections upset that her voter registration was subject to being canceled. (*Id.*) Despite this, the Board decided that it would have to take her off the voter registration rolls unless Hardison came to the hearing, sent an attorney or someone to represent her, or unless the challenge was withdrawn. (*Id.*) The final example also concerns a voter from Beaufort County. Ms. Freeman last voted in the 2012 election and was mailed a notice that was not returned to the Board. (*Id.* at 19–20; ECF No. 36 at 1–2.) At the October 29, 2016 hearing, the Board received testimony from an individual who talked to Freeman and her mom and verified Freeman's physical address. (ECF No. 36 at 1–2.) This individual also told the Board that she talked

15

with Freeman at her place of work and went by her house and that she lived at the physical address referenced at the hearing. (*Id.*) However, the Board officials stated that the correspondence that served as the challenge to Freeman's voter registration was stamped "vacant," but the mailing the Board sent had not come back undelivered. (*Id.* at 2; Tr. at 20.) Seeking an explanation as to why the first correspondence was stamped "vacant," the Board eventually acknowledged flooding at Freeman's address due to a hurricane and that it was the likely explanation. (ECF No. 36 at 1–2; Tr. at 20.) Despite these circumstances, the Board decided to postpone making a decision on her voter registration until November 7, 2016, the day before the Election, for Freeman to submit an affidavit, affirm in person, or for the challenger to withdraw the challenge to her registration. (Tr. at 20; ECF No. 36 at 3.)

The evidence in this case demonstrates why Congress prohibited the systematic removal of the names of voters so close to an election. For this election cycle, the 90-day window prohibiting the systematic removal of voters began on August 10, 2016. The Moore County Board's Director testified that she attempted to investigate the status of those voters whose eligibility to vote was challenged,[11] continuing its investigation of those challenges through October 14, 2016. (Tr. at 95–97; ECF No. 32-1 ¶¶ 6, 10, 11.) While the Moore County Board experienced such challenges in 2015, the director testified, "We did not have the time or the luxury that we had in the spring of [2015] having to do all the other duties conducting this election. . . . So our time was really critical and I can't say that I had the ability to do as

---

[11] Specifically, Moore County Board "undertook an independent investigation to determine voter status, by reviewing social media including FaceBook and official tax records in effort to locate challenged/named voters." (ECF No. 32-1 ¶ 6.)

much research and effort as I had previously." (Tr. at 96.) In Beaufort County, local residents learned of voter challenges in early-to-mid October 2016 and sought to assist those voters whose voter registration had been challenged. (ECF No. 12 ¶¶ 5–10.) There is also evidence that the Cumberland County Board undertook some effort to determine the address of the challenged voters. (Tr. at 78.) Despite the efforts of these Boards and citizens in attempting to resolve these large scale voter challenges so close to an election, Individual Plaintiffs and thousands of other eligible voters were either in jeopardy of being purged or were in fact purged from the voter rolls, placing them at risk of being erroneously disenfranchised. *See Arcia*, 772 F.3d at 1346 (explaining that the risk of disenfranchising eligible voters is greatest 90 days before the election); *see also U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008) ("[A] state cannot remove those [voter] entries in a way which risks invalidation of properly registered voters. . . . The NVRA strikes a balance between removing fraudulent registrations while ensuring that legitimate voters are able to vote." (citation omitted)).

The State Board and County Boards argue that this was an individualized challenge process and therefore is not prohibited by the 90 day provision. Testimony during the hearing on the instant motion and evidence in the record indicate that some of the County Boards engaged in efforts to verify the address of challenged voters. Through such efforts, some of the challenges appear to have been resolved in the voters' favor. However, the Court must reject Defendants' argument that the process used to purge 3,500–4,000 voters was an individualized process. All of the challenges in this case were triggered by a mass mailing returned as undeliverable. No individualized evidence was provided by the challengers in that they had used the State Board's website to develop their list of challengers. That County

17

Boards performed a perfunctory, routine review of these alleged "*en masse*" challenges, often in a single meeting, 90 days or less before the Election, arguing that they were required to do so by North Carolina law, does not alter the systematic nature in which these voters were purged from the voter rolls. In fact, the Director of the County Board in Beaufort, Kellie Hopkins, remarked during the October 7, 2016 hearing on these challenges that this so called individualized challenge procedure was "'speeding up that list maintenance process that we already have in place' that would normally take two election cycles to remove an inactive voter." (ECF No. 16 ¶ 9.)

Based on the evidence discussed above, the Court concludes that the County Boards' reliance on a single mailing that was returned undeliverable as the basis for sustaining a challenge, resulting in the County Boards systematically purging between 3,500 and 4,000 voters from registration rolls within 90 days of the General Election, was a likely violation of the NVRA. Plaintiffs have thus demonstrated a likelihood of success on the merits on their claim that Defendants violated the NVRA's 90 day provision.

## 2. Section 8's Waiting Period and Notice Provision

Plaintiffs further argue that even if, for the sake of argument, these challenges are considered individual challenges and thus are permitted under the NVRA, Defendants still violated the NVRA provision that requires notice and a waiting period of two election cycles before a voter can be purged from the voting rolls.

Section 8 of the Act provides an exhaustive list of circumstances permitting removal of voters from the registration rolls. *Husted*, 2016 WL 5328160, at *4. Where the issue concerns a voter's change of address, as in this case, the NVRA prohibits the removal of that

18

voter unless the voter confirms in writing that he or she has moved outside of the county[12] or does not respond to a notice *and* has not voted in two federal election cycles. § 20507(d)(1). In other words, "states 'shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence' without first subjecting the registrant to the confirmation notice procedure outlined in [subsection (d)(1)]." *Husted*, 2016 WL 5328160, at *5 (quoting § 20507(d)(1)). "A notice is described. . . [as] a postage prepaid and pre-addressed return card, sent by forwardable mail . . . ." § 20507(d)(2). Further, the notice must contain the following:

> **(A)** If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.
>
> **(B)** If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

§ 20507(d)(2).

The mailing that was sent to the challenged voters, including Individual Plaintiffs, did not comply with the notice requirements set out under the NVRA. The mailing was marked "DO NOT FORWARD;" (ECF No. 7-2 at 4); however, the NVRA expressly states that the notice must be sent by forwardable mail, *see id.*, and many Individual Plaintiffs indicated that

---

[12] The writing requirement is not at issue in this case.

they did not receive the mailing. As the United States explains in its Statement of Interest, the NVRA "recognizes that second-hand evidence such as mail returned as undeliverable may not actually reflect a change of residence impacting a citizen's eligibility to vote in the jurisdiction." (ECF No. 33 at 5.) There are a number of reasons why such mailings might be returned as undeliverable, including the fact that a voter may receive mail at a PO Box rather than a physical address, as did 100 year-old Plaintiff Hardison. It could also mean a change of residence within the jurisdiction, as was the case with Plaintiff Arthur.

The NVRA places the burden on the County Boards to update a voter's change-of-address within the same county. *See* 52 U.S.C. § 20507(d)(2)(A). Specifically, Section 8(f) makes clear that "[i]n the case of a change of address . . . of a registrant to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly" and further that a "registrant's name may not be removed from the official list of eligible voters by reason of such a change except as provided under subsection (d)." 52 U.S.C. § 20507(f). As the court observed in *Husted*, "[o]ne of the guiding principles of [the NVRA is] to ensure that once registered, a voter remains on the rolls so long as he or she is eligible to vote in that jurisdiction." 2016 WL 5328160, at *4 (quotation omitted).

Further, it is a violation of the NVRA to purge voters from the voter rolls without following Section 8's notice provision, which includes giving these voters two federal election cycles to vote or otherwise update their voter registration. 52 U.S.C. § 20507(d)(1). It does not matter whether the returned mailing was sent by a third party or by the County Board. Election officials are required to wait two federal election cycles following the required notice

before removing a voter from the voter rolls. Such a provision operates as a "fail-safe."[13] *See Eaton*, 581 F. Supp. 2d at 1081 ("[A] state cannot prevent a citizen from voting on the ground that the citizen has changed his or her address. This rule is . . . designed to protect the citizen's right to vote for at least two federal election cycles while the citizen updates his or her registration information.").

The Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits in establishing violations of § 20507(d) with respect to the two-year election cycle waiting period and notice required before removing an eligible voter from the voter rolls.

## B. Irreparable Harm

Plaintiffs must next make a clear showing that they are likely to suffer irreparable harm in the absence of an injunction. *Real Truth*, 575 F. 3d at 347. To demonstrate irreparable harm a party must establish that the harm is "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm;" and (2) "the harm 'must be beyond remediation.'" *League of Women Voters of the U.S. v. Newby*, --- F.3d ----, 2016 WL 5349779, at *4 (D.C. Cir. Sept. 26, 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). An injury is deemed irreparable when monetary damages are inadequate or difficult to ascertain. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7 (2008).

---

[13] *See Summary of Selected Federal Protections for Eligible Voters*, https://www.justice.gov/crt/file/889561/download (last visited Nov. 4, 2016).

It is without question that Individual Plaintiffs have made a clear showing that they will suffer irreparable harm in the absence of an injunction. The General Election is a few days away and unless Individual Plaintiffs who were purged from the voter rolls are reinstated, they will not be allowed to vote and have that vote counted.[14] Denying an eligible voter her constitutional right to vote and to have that vote counted will always constitute irreparable harm. *See Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted" (citations omitted)); *League of Women Voters*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."). Such an injury to these voters is neither speculative nor remote but is real and imminent, *In re Microsoft*, 333 F.3d at 530, and once denied the right to vote on Election Day, "there can be no do-over and no redress" for Individual Plaintiffs, *League of Women Voters*, 769 F.3d at 247. The Court therefore finds that Individual Plaintiffs have demonstrated a clear likelihood that they will suffer irreparable harm if the requested injunctive relief is not issued.

The NAACP has likewise demonstrated that they will face irreparable harm if an injunction does not issue. An organization has been harmed in its own right if the defendant's actions "perceptibly impaired" the organization's programs, making it more difficult to carry out its mission. *See Havens Realty v. Coleman,* 455 U.S. 363, 379 (1982); *Lane v. Holder*, 703 F.3d

---

[14] Plaintiff Cox believes the challenge against him was withdrawn; however, he states that the Beaufort County Board has not confirmed the withdrawal of the challenge to his registration. (ECF No. 11 ¶ 13.)

668, 674–75 (4th Cir. 2012). The NAACP in this case has satisfied this burden.[15] The NAACP alleges that it has had to "divert its finite and limited resources away from its planned voter-protection and education efforts" and to continue to "dedicate its limited staff and resources to ensuring that these challenges do not unlawfully disenfranchise any of its members" due to Defendants' conduct. (ECF No. 7 ¶¶ 23–24; ECF No. 5 ¶¶ 29–32.) Such a diversion of resources in response to Defendants' alleged noncompliance with the NVRA "perceptibly impair[s]" the NAACP's ability to mobilize, educate and protect voters before and during the General Election, a key piece of its mission. *Havens Realty*, 455 U.S. at 379; *Lane*, 703 F.3d at 674–75. That the NAACP would have to continue to divert resources in the absence of relief is enough to satisfy its burden of showing a likelihood of suffering irreparable harm.

## C. Balance of the Equities and Public Interest Factors

The Court must next determine whether the balance of the equities weighs in favor of granting Plaintiffs' requested injunctive relief. Plaintiffs request that this Court enter a preliminary injunction:

> (1) enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them from: (a) canceling the registrations of voters through the challenge procedures provided in N.C. Gen. Stat. §§ 163-85, 163-86, when those challenges are based on change of address and the state has neither received written confirmation from that voter of a change in residence outside of the county, nor complied with the NVRA's two-year election cycle waiting period; (b) using such challenge procedures in §§ 163-85, 163-86 to purge voters from the voter rolls based on residency information within 90 days of a federal election; and (c) holding

---

[15] In addition to pleading standing in their own right, the NAACP has also sufficiently pled associational standing on behalf of its members. (*See* ECF No. 5 ¶¶ 26–27; ECF No. 7 ¶¶ 20–21); *Arcia*, 772 F.3d at 1342. Because the NAACP members are likely to suffer irreparable harm if Defendants' challenged conduct is not enjoined, the NAACP has satisfied its burden of showing a likelihood of suffering irreparable harm on behalf of its members absent relief from this Court.

hearings or taking other actions to process challenges filed under those statutes in circumstances identified;

(2) directing Defendants to: (a) restore the voter registrations that were canceled based on returned mail or other evidence of a change of address through the challenge procedures provided in §§ 163-85, 163-86; (b) issue directives and take any other measures to ensure that such voters can cast regular ballots on or before November 8, 2016 and in future elections, including by prohibiting same-day challenges to such restored voters, as well as previously challenged voters pursuant to N.C. Gen. Stat. § 163-87 if those voters appear in person on November 8, 2016; and (c) provide mailed notice and other public notice that is reasonably calculated to reach those voters whose registrations were challenged under §§ 163-85, 163-86, whether those registrations were canceled or not, informing those voters that their registrations remain valid and they will be able to cast regular ballots in the upcoming elections.

(ECF No. 1 at 37–39.)

The Court notes that at the hearing, Plaintiffs requested that the Court expand any injunctive relief granted to include additional counties set forth in a declaration filed by the Executive Director of the State Board, which provided data about other counties that had allowed purging of voter registrations based on individual challenges over a 24-month period. (ECF No. 39-1 ¶ 8.) The Court declines to expand any relief to the counties not named in this lawsuit and for which the Court has no specific information regarding the process used in those counties or the specific nature of the challenges. The additional counties are not properly before the Court, and the Court "may not enjoin defendants not before [it]." *Hubbard v. Byars*, No. 8:14–33–BHH, 2015 WL 337642, at *14 (D.S.C. Jan. 26, 2015) (citing *Zepeda v. United States I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)). Thus, the Court will confine its consideration to the three counties named in this lawsuit and challenges that have been sustained on or after August 10, 2016.

It appears that Plaintiffs' requested relief "aim[s] to maintain the status quo and prevent irreparable harm while a lawsuit remains pending," specifically before the Federal Election on November 8, 2016. *League of Women Voters*, 769 F.3d at 236 (quoting *Pashby*, 709 F.3d at 319)). The 'status quo' is defined in this Circuit as "the last uncontested status between the parties which preceded the controversy." *Aggarao*, 675 F.3d at 378 (quotation omitted). This is a case where it is "necessary to require a party who has recently disturbed the status quo to reverse its actions." *Id.* (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004)). Because a preliminary injunction remains an "extraordinary remed[y]," *In re Microsoft*, 333 F.3d at 524, the Court must, and has in this case, carefully considered the impact on each party before granting relief.

The Court concludes that the balance of the equities and public interest factors weigh decidedly in favor of protecting eligible voters who are being removed from the voter rolls and having their registrations canceled based on a single mailing returned undeliverable. Particularly where, as in this case, the voter is often unaware that the registration is being challenged. The Court finds that a narrowly tailored injunction is warranted to ensure that eligible voters are not deprived of their right to participate in the upcoming election due to a flawed process engaged in by the State and County Boards, which this Court has determined likely violates the NVRA. In addition, the Court concludes that any burden imposed by virtue of these likely violations must be borne by the State and the counties and not by the wrongfully purged voter. Based on the evidence in the record, the Court concludes that the burden to the State and the counties in complying with the requested injunctive relief would be minimal. Each of the Defendant counties testified that they could, with minimum effort, identify those

voters wrongfully removed from the voter rolls. Further, there was testimony that restoring these voters to their status prior to the challenge and subsequent removal from the rolls could be accomplished. (*See* Tr. at 118–19, 148.)

Nor is the Court persuaded, as argued by the State Board, that each of the wrongfully purged voters should be required to cast provisional ballots. If these voters are restored to their status before the challenge and purging occurred, then they should be treated on Election Day as though no challenge ever occurred and should be allowed to cast their ballot in the normal course. Thus, if a voter's status before being challenged was "inactive," her county of residence will restore her registration, which will again read as "inactive." Then, on Election Day, that voter may go to the polling place in her home precinct, update her address, and vote by regular ballot just as she would if a challenge had never been entered against her. Similarly, if the inactive voter visits a polling place outside of her home precinct, she will be asked to update her address and vote by provisional ballot, just as she would if her registration had never been challenged in the first place.

The State Board argued at the hearing that this relief could result in so-called "double voting," meaning people could conceivably vote twice, or it could result in a new registration being canceled by the restored registration. (Tr. at 44, 46; *see* ECF No. 39-1 ¶¶ 11–12.) First, in terms of double voting, there is no evidence before the Court that double voting has been, or will be, an issue in North Carolina. Second, the number of voters who may have re-registered since being canceled is likely to be small, thus the State Board can simply cross-reference the list of newly restored voters with lists of new registrants to make sure no voter's new registration is unduly canceled due to the Court's relief. The State contends that this

process may be burdensome.  (Tr. at 153–54; ECF No. 39-1 ¶¶ 12, 14.)  Given that the State has repeatedly argued that the number of voters harmed by its challenge process is small compared to the number of overall voters in North Carolina, the State cannot now argue that the burden of correcting the issue that it caused will be unduly burdensome.  As this Court and others have recognized, "even one disenfranchised voter . . . is too many."  *League of Women Voters*, 769 F.3d at 244.  Any additional burden that may result from restoring voter registrations that were improperly canceled should fall on the State, not on the voter.  Defendants have thus failed to demonstrate that they face hardship in complying with this Court's order for injunctive relief.

Finally, the Court concludes that the public interest factor weighs heavily in favor of the injunctive relief described herein and filed as a separate Order simultaneously with this Opinion.  "By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'"  *Id.* at 247–48 (alteration in original) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)).  Congress passed the NVRA for the specific purpose of "establish[ing] procedures that will increase the number of eligible citizens to register to vote" and "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b).  Voter enfranchisement cannot be sacrificed when citizens through no fault of their own have been removed from the voter rolls.  Absent such relief Plaintiffs would likely suffer great harm in that thousands of North Carolina voters may be disenfranchised.  It does not matter whether it is done intentionally or through human or technological errors.  Either scenario could lead to a voter's wrongful exclusion from the voter rolls on Election Day.  "[F]avoring enfranchisement and ensuring that qualified voters' exercise their right to vote" is

always in the public interest.[16]  Moreover, electoral integrity is enhanced, not diminished, when all citizens who are eligible to vote are allowed to exercise that right free from interference and burden unnecessarily imposed by others.

## V.    CONCLUSION

Based on the foregoing, the Court concludes that Plaintiffs' Motion for Preliminary Injunction should be, in this Court's discretion, granted in part and denied in part.  An Order granting a Preliminary Injunction shall be filed simultaneously with this Memorandum Opinion.

This, the 4th day of November, 2016.


_____/s/ Loretta C. Biggs_____
United States District Judge

---

[16] *Fish v. Kobach*, --- F. Supp. 3d ----, 2016 WL 2866195, at *31 (D. Kan. May 17, 2016) (quoting *Husted*, 697 F.3d at 437).