IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:16-cv-1274-LCB-JLW

| | |
|---|---|
| N.C. STATE CONFERENCE OF THE NAACP, *et al.,* | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| N.C. STATE BD. OF ELECTIONS, *et al.*, | ) ) |
| Defendants. | ) ) |
| _____ | ) |

## BRIEF OF THE BEAUFORT COUNTY DEFENDANTS IN OPPOSITION TO THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**NOW COME** the Defendants Beaufort County Board of Elections, Jay McRoy, in his official capacity as Chairman of the Beaufort County Board of Elections, John B. Tate, III, in his official capacity as Secretary of the Beaufort County Board of Elections, Thomas S. Payne II, in his official capacity as Member of the Beaufort County Board of Elections, and Kellie Harris Hopkins, in her official capacity as Director of the Beaufort County Board of Elections (collectively[1] "the Beaufort County Defendants"), by and through undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 56.1 and 7.2, and submit this Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion").

---

[1] Because the members were sued only in their official capacity, any new members will be automatically substituted as defendants in their official capacities. *See* Rule 25(d) of the Federal Rules of Civil Procedure.

1

Furthermore, the Beaufort County Defendants request that this Court grant partial summary judgment *sua sponte* in favor of the Beaufort County Defendants on the Plaintiff's claims under the National Voter Registration Act ("NVRA") set forth in their Motion.

## INTRODUCTION

In ruling on Plaintiffs' Motion, the Court is not presently tasked with determining the constitutionality of the North Carolina statutes which govern the voter challenge process followed by the Beaufort County Defendants, nor is the Court tasked with determining what acts theoretically *could* have been taken under that challenge process which might potentially violate the NVRA. Instead, the matter presently before the Court only concerns whether the actual acts and omissions by the Beaufort County Defendants, taken at all times pursuant to the North Carolina voter challenge statutes, violated the NVRA. The plain language of the NVRA, read in conjunction with federal case law interpreting it, shows that no act or omission of the Beaufort County Defendants violated the NVRA.

## FACTS

The Plaintiffs and the Beaufort County Defendants stipulated to the following facts:

In 2015, a political campaign in Beaufort County sent campaign mailings to individuals registered on the voting rolls in the city of Belhaven, Beaufort County. (Doc. 99 at ¶ 3). Based on the return of some mailings, challenges against at least 138

2

registered voters in Beaufort County were brought on or around October 4, 7, 12, and 14, 2016 by four individuals. (Doc. 99 at ¶¶ 1, 3). The submitted challenge forms "challenged the voter's 'right to remain registered to vote' and/or 'right to vote,'" on the grounds that the "person is not resident of the municipality in which the person is registered" and/or the "person is not a resident of the precinct in which the person is registered." (Doc. 99 at ¶ 2).

On October 7, 2016, the Beaufort County Board of Elections ("Beaufort CBOE") held a preliminary hearing on 29 of those challenges, as required by N.C.G.S. § 163-85(d).[2] (Doc. 99 at ¶¶ 4 and 26). Of those 29 challenges, eight "were either withdrawn by the challenger or dismissed by the Beaufort CBOE because the voter's voter registration records had already been updated or the voter had already been removed." (Doc. 99 at ¶ 4). The Beaufort CBOE determined that probable cause existed for the remaining 21 voter challenges. (Doc. 99 at ¶ 5). After that October 7 preliminary hearing, the "Beaufort CBOE sent notice of challenge letters via first class mail to the [21] challenged voters for whom it found probable cause as required" by § 163-86(b). (Doc. 99 at ¶ 8; *see* Doc. 99-1). That notice informed each challenged voter that the voter's right to remain registered to vote had been challenged with the Beaufort CBOE, that a hearing had been scheduled to address the challenge, and what the voter needed to do to verify his or her identity. (*See* Doc. 99-1).

---

[2] Effective 2017, the challenge provisions of N.C.G.S. § 163-84 *et seq.* were recodified verbatim and in their entirety at N.C.G.S. § 163A-910, *et seq.* (2017 N.C. Sess. Laws 6). For the purposes herein, N.C.G.S. § 163-84, *et seq.* will be cited and referred to as this was the law at the time at issue in this matter.

On October 24, 2016, the Beaufort CBOE "held a full challenge hearing on the merits of the 21 voter challenges for which the CBOE found probable cause at the October 7, 2016 preliminary hearing." (Doc. 99 at ¶ 14). Following the procedure established by North Carolina statute, each challenged voter was called individually, each challenge was heard individually, and the CBOE voted separately on each challenge. *See* N.C. GEN. STAT. §§ 163-86(c); *see also*, *e.g.*, Doc 99 ¶¶ 14-21. "[S]even challenges were withdrawn or rejected/dismissed, either in advance of or during the full challenge hearing" based on updated information. (Doc. 99 at ¶ 14). The Beaufort CBOE sustained the challenges against 14 of the remaining challenged voters, removing them from the voter rolls as required by N.C.G.S. § 163-90.2. (Doc. 99 at ¶¶ 15 and 26).

On October 14, 2016, the Beaufort CBOE held a second preliminary hearing on 109 challenges. (Doc. 99 at ¶ 9). Twenty-four of the 109 challenges were dismissed based on updates to the voter's registration records. (Doc. 99 at ¶ 9). The Beaufort CBOE found probable cause to remove the remaining 85 challenges. (Doc. 99 at ¶ 10). Once again, the "Beaufort CBOE sent notice of challenge letters via first-class mail to the challenged voters for whom it found probable cause as required" by § 163-86(b). (Doc. 99 at ¶ 13; Doc. 99-2). That notice informed the voter that the voter's right to remain registered to vote had been challenged with the Beaufort CBOE, that a hearing had been scheduled to address the challenge, and what the voter needed to do to verify his or her identity. (Doc. 99-2).

4

"On October 29, 2016, the Beaufort County CBOE held a second full challenge hearing on the merits of the 85 voter challenges for which the CBOE found probable cause at the October 14, 2016 preliminary hearing." (Doc. 99 at ¶ 17). Again, following statute, each challenged voter was called individually, each challenge was heard individually, and the CBOE voted separately on each challenge. *See* N.C. GEN. STAT. §§ 163-86(c); *see also*, *e.g.*, Doc 99 ¶¶ 14-21. Twenty-one challenges were withdrawn, rejected, or dismissed, either in advance of or during the full challenge hearing based on updated information. (Doc. 99 at ¶ 17). The Beaufort CBOE sustained 51 challenges, removing the voters from the voter rolls as required by N.C.G.S. § 163-90.2. (Doc. 99 at ¶¶ 18, 21). The Beaufort CBOE postponed until November 7, 2016 hearings as to the remaining 13 challenges based on testimony at the full challenge hearing that the voter continued to reside in Beaufort County or consider Beaufort County his or her domicile. (Doc. 99 at ¶¶ 18–19, 21).

For example, representatives for Plaintiff Grace Bell Hardison and Debra Greene Blount contacted the office of the Beaufort CBOE to inform it that the challenger's mailing had been returned because the voter's mailing address had not been used. (Doc. 99 at ¶¶ 6–7). For Plaintiff James Lee Cox, the challenger ultimately withdrew its challenge upon Beaufort CBOE's receipt of information that Mr. Cox's mailing address had not been used and that he continued to reside in the county and be eligible to vote. (Doc. 99 at ¶ 12).

Therefore, of the 29 challenges considered at the October 7, 2016 preliminary hearing, probable cause was only found for 21 of the challenges, and only 14 challenges were sustained and led to the removal of the voter after the full challenge hearing. (*See* Doc. 99 at ¶¶ 4–5, 15). Of the 109 challenges considered at the October 14, 2016 preliminary hearing, probable cause was only found for 85 of the challenges, and only 51 challenges were sustained and led to the removal of the voter after the full challenge hearing. (*See* Doc. 99 at ¶¶ 9–10, 21). In sum, 73 of the 138 registered voters who were challenged had their challenges withdrawn, dismissed, or postponed based on individualized information received and considered by the Beaufort CBOE.

## ARGUMENT

### I.  Summary Judgment Standard and Granting in Favor of the Nonmovant

As a general rule, summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). However, a Court "has the power to grant summary judgment *sua sponte* in favor of the nonmovant where no genuine issue of material fact exists and the nonmovant is entitled to judgment as a matter of law." *Crampton v. Immediato (In re Persinger)*, No. 5:16-CV-118-FL, 2016 U.S. Dist. LEXIS 110520, at *12 (E.D.N.C. Aug. 3, 2016); *see also Helton v. Good*, 208 F. Supp. 2d 597, 608 (W.D.N.C. 2002), *aff'd in relevant part*, 330 F.3d 242 (4th Cir. 2003). In determining "whether a *sua sponte* grant of summary judgment is appropriate, the key inquiry is whether the losing party was on notice that he or she had to marshal the evidence necessary to withstand summary

6

judgment." *Crampton*, 2016 U.S. Dist. LEXIS 110520, at *12 (internal quotation marks omitted); *see also Amzura Enters. v. Ratcher*, 18 F. App'x 95, 103 (4th Cir. 2001). Courts have found the moving party to have been put on adequate notice when the Court is considering granting summary judgment in favor of the nonmovant on an issue identical to that raised by the movant. *Ratcher*, 18 F. App'x at 104 n.8.

Here, the Beaufort County Defendants and the Plaintiffs worked for several weeks to agree upon stipulated facts which both sides believe are relevant to the Plaintiffs' NVRA claims and the Defendants' defenses to those claims. The issue on which the Beaufort County Defendants request entry of summary judgment in their favor is identical to that of the Plaintiffs, namely, "Did the acts and omissions of the Beaufort County Defendants violate the NVRA?" Because the parties' summary judgment issues are identical, the Plaintiffs are on notice that they had to marshal the evidence needed to achieve summary judgment, which by definition is significantly less than "the evidence necessary to withstand summary judgment." Therefore, judgment as a matter of law is appropriate on the NVRA claims in the Beaufort County Defendants' favor.

## II.     The Plaintiffs Cannot Show a Violation of the NVRA by the Beaufort County Defendants

### A.     Plaintiffs were not Eligible Voters to Whom the NVRA Applies

Plaintiffs argue extensively that with respect to removals from voting rolls due to changes in residence, under the NVRA "[a] State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office . . . unless the registrant" confirms the change in residency in writing or the registrant both fails to

7

respond to the statutorily prescribed notice *and* fails to vote or appear to vote in two consecutive federal election cycles. 52 U.S.C. § 20507(d); (Doc. 94 at 15). Because the Plaintiffs only address whether statutorily prescribed notice was given and whether the Beaufort CBOE waited two election cycles before striking non-responsive voters, they completely skip over the determination which must be made prior to ever analyzing the removal of voters under the NVRA. To even reach the Plaintiffs' arguments, the Court must first begin with the assumption that Plaintiffs were eligible voters to whom the NVRA applied. The NVRA does not allow, much less mandate, such an assumption. Because an enumerated purpose of the NVRA is to "ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(4), multiple federal courts have correctly held that the NVRA only protects *eligible* voters and therefore allows for a process to accurately ascertain whether or not a potential voter falls within the category eligible voters who are protected by the NVRA or ineligible voters who are not.

In *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004), the Sixth Circuit Court of Appeals held that "Congress did not intend [the NVRA] to bar the removal of names from the official list of persons who were *ineligible* and improperly registered to vote in the first place." *Bell*, 367 F.3d at 591–92 (emphasis added). In *Bell*, individual Ohio residents filed challenges to the registrations of nearly one hundred voters pursuant to voter removal procedures under the Ohio Revised Code. *Id.* at 589. All challenges were based on the grounds that the challenged voters were not permanent residents of the precinct and therefore not qualified or eligible to vote. *Id.* The board of elections held

8

hearings on each challenge to a voter's registration, devoting each hearing to investigating and examining the challenged voter's residency. *Id.* at 590, 592. Based on the information gathered at the hearing on each challenged voter, the board denied the challenge to one voter's registration, referred one challenge to the Secretary of State who sustained it, and sustained the remaining challenges upon finding sufficient evidence to conclude that the challenged voters were not residents of the precinct and therefore were ineligible to vote. *Id.* at 590. Consequently, the board removed the names of the voters whose challenges were sustained from the voter rolls, reasoning that the presence of the ineligible voters on the rolls rendered the rolls inaccurate. *Id.* at 592.

As in this action, the *Bell* plaintiffs filed suit for injunctive relief, arguing that the Board's procedures violated the NVRA. *Id.* In granting summary judgment in favor of the Board, the district court held that to read the NVRA as the plaintiffs wanted it read, "would require a finding that the defendants violated [52 U.S.C. § 20507(a)(3)] because none of the plaintiffs had requested removal from the list, been convicted of a crime, been found mentally unfit, or had changed residences." *Bell*, 235 F. Supp. 2d 772, 776 (N.D. Ohio 2002). However, the district court found this reading ignored the "precondition to being entitled to vote [sic]: name[ly] residency in the precinct. If a person is not a resident, he is not a 'qualified elector.'" *Id.* The district court concluded that the NVRA does not protect the "franchise of persons not entitled to vote," and to hold otherwise would be to undermine the integrity of the electoral process and would "dilute the franchise of those duly qualified to vote." *Id.*; *see* 52 U.S.C. § 20501(b)(3).

The Sixth Circuit Court of Appeals affirmed, holding that through the board's process, which included an individual examination of each challenge, the board reached the conclusion that the registrants were ineligible to vote and removed them from the voter rolls. *Bell*, 367 F.3d at 592. The Court reasoned that the NVRA "protects only 'eligible' voters from unauthorized removal," and does not "bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Id.* at 591–92. "Eligible voters, at a minimum, are those who qualify as bona fide residents of the precinct in which they are registered or wish to register to vote." *Id.* at 592. The Court reasoned that "[w]ere we to find that the Board's removal of these voters does violate the [NVRA], we would effectively grant and then protect, the franchise of persons not eligible to vote." *Id.* Instead, the Court held that the NVRA "encourages the Board to maintain accurate and reliable voting rolls" and "does not bar the Board's continuing consideration of a voter's residence." *Id.*

Notably, nowhere in their opinions in the *Bell* cases do either the District Court or the Sixth Circuit ever analyze or even discuss the factual or legal correctness of the findings by the Ohio board that the challenged voters were not residents and therefore not eligible voters. Instead, the key to *Bell*'s holding is that both Courts focused on the fact that a *process* was used to determine voting ineligibility. The Ohio board did not simply automatically remove *en masse* every voter who met certain criteria. Instead, the board used Ohio's statutory process, including individualized examinations at various stages in a process involving a hearing, which led to the board uncovering the finding that the

10

voter was ineligible.  Only upon finding that the voter was ineligible did the board remove the voter.  *Id.*  As a result, the Ohio board's process for removal of ineligible voters did not violate the NVRA, because the removed registrants were not "eligible voters" to begin with.

Ignoring the clear precedent of *Bell*, the Plaintiffs instead use the case of *United States Student Association Foundation v. Land* to argue that the "NVRA 'limits the methods which a state may use to remove individuals from its voting rolls' in order to 'ensure that eligible voters are not disenfranchised by improper removal.'"  (Doc. 94 at 15) (quoting *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 381 (6th Cir. 2008)). However, the facts of *Land*, where the state used little to no process prior to removing a voter, are in stark contrast to the facts of this matter and those of *Bell*, and therefore serve to show why the voter challenge process employed by the Beaufort CBOE is acceptable under the NVRA.

In *Land*, the Sixth Circuit Court of Appeals examined Michigan's voter registration process.  Pursuant to Michigan law, persons desiring to register to vote submitted applications, and once those applications were reviewed and the person was deemed qualified as an elector, the person's information was entered into a statewide voter registration database, the Qualified Voter File ("QVF").  *Land*, 546 F.3d at 376.  As a default, all electors entered into the QVF were listed as "active" and deemed qualified to vote.  *Id.* at 377.  At that point, the elector was mailed an "original voter ID card."  *Id.* "[I]f the 'original' voter identification card [was] not returned to the clerk's office, its

receipt [was] presumed and the applicant bec[ame] a registered voter in the State of Michigan." *Id.* However, if "the original voter identification card [was] returned to the clerk by the post office as nondeliverable, the clerk [was mandated to] reject the registration and send the individual a notice of rejection." *Id.* (citing MICH. COMP. LAWS § 168.499(3)). "If no forwarding address [was] provided by the post office, the individual's QV status [was] changed from 'active' to 'reject-residence,'" and the individual was not placed on the voter roll. *Id.* at 377–78.

The plaintiffs in *Land* sued for injunctive relief, arguing that Michigan's practice of changing a voter's status from "active" to "rejected" based solely on an undeliverable voter ID-card violated the NVRA's removal statute. *Id.* at 378–79. The district court granted their preliminary injunction, and the Sixth Circuit Court of Appeals affirmed, finding that the defendants would be unable to show that the removal based solely on undeliverable ID-cards did not violate the NVRA. *Id.* at 380–81. In so holding, the Sixth Circuit held that *Bell* was distinguishable because in *Bell*, the plaintiffs challenged the removal of voters found to be *ineligible* after following a process in place under Ohio statutory law, which – significantly – included individualized inquiry and a hearing. *Id.* at 386 ("[T]he Ohio law at issue in [*Bell*] permitted the state, *after a hearing on the issue*, to remove the names of *ineligible* individuals from its rolls."). Instead, the *Land* Court held that Michigan had no *process* in place for the board of elections to determine whether the voter was eligible or not *prior* to the removal of the voter. *Land*, 546 F.3d at 385–86 ("The rejection of an *eligible* voter based solely on the undeliverable-voter-ID-

12

card practice is not at all similar to the state's hearing-based determination that a particular challenged individual is not an eligible voter and should therefore be removed from the voting rolls."). In *Land*, "there ha[d] never been a determination that the voter [was] ineligible" because the mere return of a mailed voter-ID card *automatically* deemed the voter ineligible. *Id.* at 386. Therefore, the Plaintiffs' reliance on *Land* is unfounded in this matter, where there was a statutory process in place which included hearings to determine whether the voter was ineligible to vote.

In contrast to the facts of *Land*, the statutory process followed by the Beaufort CBOE here closely aligns with those of the Ohio board of elections in *Bell*. Here, four individuals brought forth challenges against 138 voters challenging their right to remain registered to vote or vote on the grounds that the voter was not as resident of the municipality or precinct in which the person was registered to vote on the basis of returned mail. (Doc. 99 at ¶¶ 1–3). However, unlike in *Land*, the mere return of mail here did not automatically deem the voter ineligible. Instead, like in *Bell*, the Beaufort CBOE undertook a process to first determine whether the voter was eligible or ineligible. This process included a preliminary hearing to determine whether probable cause existed for each individual challenge, and only if probable cause was found, was a full hearing on the merits held for each individual challenge. (Doc. 99 at ¶¶ 4–5, 9–10, 14, 17). Only during the full hearing on an individual challenge did the Beaufort CBOE consider all evidence, both for and against the challenged voter, and based upon the totality of the circumstances, reach a determination regarding whether a voter was ineligible and could

13

be removed. (Doc. 99 at ¶¶ 15, 18). In fact, at multiple points in time, challenges were withdrawn, rejected, or dismissed based upon information received and uncovered by the Beaufort CBOE regarding a voter's eligibility. (Doc. 99 at ¶¶ 14, 17).

As the Court in *Bell* reasoned, the NVRA "protects only eligible voters from unauthorized removal." Other Courts have endorsed that view, holding that:

> The salient issue under the NVRA is less a voter's presence or designated registration status on a state's federally-mandated statewide electronic voter registration database, but on his actual, de jure, "eligibility" to vote. It is clear under *Land* and otherwise that state law informs this analysis. Congress's mandate in the NVRA was for states to register "all eligible applicants," and to maintain the accuracy of the resulting "official lists of eligible voters" by removing the names of those who are not actually eligible or who have become ineligible over time.

*Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1263 (2010). Here, after the Beaufort CBOE completed its above-detailed process, it only sustained challenges of individual voters who were found to be ineligible after a full hearing on each separate challenge. Following *Bell*, the NVRA cannot protect the voters found to be ineligible by the Beaufort CBOE, because those voters were not at that time "eligible voters" to which the NVRA applied. The Beaufort CBOE employed a hearing process to assess the eligibility and residency of challenged voters. As this process determined that the voters were ineligible before the NVRA could even apply, no violation of the NVRA could have occurred and summary judgment should therefore be denied as to the Plaintiffs and granted as to the Beaufort County Defendants.

14

**B.**     <u>The Beaufort CBOE Did Not Utilize Any Program which has a "Purpose" of "Systematically" Removing Voters</u>

Under the NVRA, a "State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). It is important to parse the plain language of that statute to discern what is and what is *not* prohibited by the NVRA within 90 days of an election. To be barred, a program (1) must have as its purpose the removal of voters *and* (2) must be accomplishing that purpose in a systematic fashion.[3] Here, the undisputed and stipulated facts establish that the statutory challenge procedures utilized by the Beaufort CBOE had neither the *purpose* of removing voters nor of *systematically* doing so in violation of the NVRA. Because the Plaintiffs have shown neither of the factual prongs necessary to establish a violation of 52 U.S.C. § 20507(c)(2)(A), their Motion for Partial Summary Judgment should be denied and partial judgment should be granted as a matter of law in favor of the Beaufort County Defendants.

    **1.**     <u>The Program Used by the Beaufort County Defendants did not "Systematically" Remove Voters</u>

The word "systematic" is not defined in the NVRA. Rather than defining what "systematic" *is*, federal courts have instead defined what it is *not*. For a removal of a registered voter from the rolls to be "systematic," that removal must be performed

---

[3] The Court in *Arcia* parsed the language of the 90-day provision, looking to see (1) whether the removal under the program was done "systematically" and (2) whether the purpose of the program was to remove "ineligible voters" from the voter rolls. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014).

15

without *individualized* investigation, consideration, or hearing. *See, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) (requiring individualized investigation); *Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir 2004) (allowing consideration of individual factors). The Plaintiffs rely on the case of *Arcia v. Florida Secretary of State* for the proposition that use of the North Carolina statutory challenge procedure results in *systematic* removals of voters, which is prohibited within 90 days of a federal election under the NVRA. (Doc. 94 at 21). However, a close reading of *Arcia* reveals significant factual differences between the voter removal "system" (to the extent it can even be described as such) used by the Florida Secretary of State and the statutorily-prescribed voter challenge hearing procedures used by the Beaufort County Defendants. When those factual differences are considered, the *Arcia* Court's analysis actually shows that the Beaufort County Defendants did not engage in a program to systematically remove voters. As a result, the 90 Day Provision of the NVRA, 52 U.S.C. § 20507(c)(2)(A), does not apply to the Beaufort County Defendants' challenge practice and could not have been violated.

In *Arcia*, the Eleventh Circuit Court of Appeals considered whether the Florida Secretary of State's removal of names of ineligible voters from the voter rolls was performed systematically in violation of the NVRA. The Florida Secretary of State, unilaterally and without legislative approval, initiated two programs to remove non-citizens from voter rolls. *Arcia*, 772 F.3d at 1339. In those programs, he used a database from Florida's Department of Highway Safety and Motor Vehicles and a database from

16

Florida's Department of Homeland Security, the latter entitled "Systematic Alien Verification for Entitlements" ("SAVE"), to check the citizenship of registered voters. *Id.* The names of registered voters identified as non-citizens – or even "suspected" non-citizens – in the databases were forwarded to state supervisors who then *automatically* removed the voter from the voter rolls without any hearing, within 90 days of a federal election. *Id.* at 1340.

The Eleventh Circuit found that Florida's program violated the NVRA because it was designed to remove the names of ineligible voters from the list of eligible voters and did so systematically–without individualized inquiry. The Court looked at the plain meaning of the word "systematic" and held that Florida's program was a "systematic program under any meaning of the word" because it "did not rely upon individualized information or investigation to determine which names from the voter registry to remove." *Id.* at 1343–44. Furthermore, the Court took note of the obvious fact that the "S" in "SAVE" stood for "systematic." *Id.* at 1344.

Significant to this case, the *Arcia* Court held that "by limiting its reach to programs that 'systematically' remove voters from the voter rolls, the 90 Day Provision [of the NVRA] permits removals based on *individualized* information at any time." *Id.* at 1346. Therefore, the *Arcia* Court noted that "the 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window." *Id.* at 1348. The Court pointed out that removal based on "individual correspondence or rigorous individualized

inquiry, lead[s] to a smaller chance for mistakes." *Id.* at 1346. Following that analysis, for the 90-day provision of the NVRA to apply to the actions of the Beaufort County Defendants, the Plaintiffs must show that the Beaufort County Defendants employed a general program that "systematically" removed voters from the voter rolls without "individualized information" or inquiry.

Looking at the voter challenge procedures used by the Beaufort CBOE, the stipulated facts show that when an individual challenge was made, the Beaufort CBOE followed North Carolina statutes and first held a preliminary hearing regarding each individual challenged voter to determine whether probable cause existed for each challenge. In cases where probable cause for a particular voter's removal was found, the Beaufort CBOE then sent a notice of challenge letter to that voter which informed the voter that a full hearing had been scheduled to address the challenge. The notice letter – regardless of whether it complied with the NVRA – was "individual correspondence" under any fair meaning of that term because each individual voter was sent a letter which identified (1) who had challenged that specific voter, (2) the legal basis for the challenge under N.C.G.S. § 163-85, and (3) the time and place of the voter's full challenge hearing. (*See, e.g.*, Docs. 99-1 and 99-2).

Only after those individual letters were sent to each voter was a full hearing on the merits of each challenge held. Each challenge was called and considered individually. Those individual hearings included testimony from witnesses about particular challenged voters. After hearing all the evidence in each case, the Beaufort CBOE then followed

18

North Carolina statute to weigh the evidence regarding each challenged voter. The Beaufort CBOE then voted on each challenge separately.

Therefore, regardless of whether the Plaintiffs quarrel with the fairness of the hearing process regarding each challenged voter, it is undisputed that the Beaufort CBOE conducted "individualized inquiry" in making a determination about each challenged voter. The facts further show that this individualized inquiry resulted in different outcomes for different challenged voters, which could not have been the case if the Beaufort County Defendants had used a "systematic" process like the Florida Secretary of State in *Arcia*. This is supported by the fact that each challenge was considered and voted on individually. Less than half of the challenges in Beaufort County were sustained, and less than half of the voters challenged were removed from the voter rolls. The majority of the challenges were either dismissed for lack of probable cause, withdrawn or rejected/dismissed based upon updated voter information or testimony at the full hearing, or postponed until further information could be obtained to make a determination.

Consequently, the Plaintiffs' assertion in their Brief that the "Beaufort CBOE ordered a 65-voter purge over the course of two hearings" is, at best, misleading. (Doc. 94 at 23). While 65 voters were removed over the course of two days of hearings, 65 individual hearings occurred over those two days. Further, the Plaintiffs' statement that the "Defendants held hearings where they processed challenges and purged voters in large batches" and "without individualized voter information," (Doc. 94 at 23) is

19

completely unfounded and directly contradicts the stipulated facts agreed to by the Plaintiffs. While the Plaintiffs would no doubt argue that the voter challenge process used by the Beaufort County Defendants was not fair, the fairness of that process is not at issue here. Here, the only issue this Court is considering is whether the process used by the Beaufort CBOE was "systematic" because it was not "individualized." The undisputed evidence shows that the Beaufort CBOE only utilized an "individualized" process.

Because "systematic" is normally defined as "methodical in procedure or plan,[4]" almost any program which repeats itself while following a set of rules could arguably be described as "systematic." Federal courts have realized that such a definition would be far too broad to interpret 52 U.S.C. § 20507(c)(2)(A), as such a definition would bar even individualized – and therefore all – voter removals within 90 days of an election. As explained in *Arcia*, a program such as the one utilized by the Beaufort CBOE cannot be categorized as "systematic" because it relies upon individualized information or investigation to determine which names from the voter registry to remove. Between the preliminary hearing on probable cause, analysis of updated voter information, and testimony received at the full challenge hearing, the program employed by the Beaufort County Defendants cannot meet the definition of "systematic" under any meaning of the

---

[4] https://www.merriam-webster.com/dictionary/systematic (last visited April 1, 2018).

word.  Because the system of challenge is not "systematic," it is not subject to and could not have violation the 90-day provision of the NVRA.[5]

### 2. The Program Used by the Beaufort County Defendants did not have the "Purpose" of Removing Voters

Furthermore, under 52 U.S.C. § 20507(c)(2)(A), to violate the NVRA the "purpose" of the systematic program employed must be to "remove" the names of voters from the voter rolls.  When the North Carolina's challenge statutes are read as a whole, the "purpose" of the program here was not the *removal* of voters, but the *verification* of the eligibility of voters.  *See* N.C. GEN. STAT. § 163-84, *et seq.*

Under North Carolina law, "any registered voter of the county may challenge the right of any person to register, remain registered or vote in such county."  N.C. GEN. STAT. § 163-85(a).  Such challenges may only be made for an exhaustive list of enumerated reasons.  § 163-85(c).  When such a challenge is made, the county board of elections schedules a preliminary hearing to determine whether probable cause exists that the challenged person is not qualified to vote.  § 163-85(d).  At this preliminary hearing, the burden is on the challenger to present evidence that the challenged voter is not qualified to vote.  *Id.*  If probable cause is not found, the challenge is dismissed; but if probable cause is found, a full challenge on the merits is scheduled.  *Id.*  At this full hearing on the merits, the challenged voter, or someone on his or her behalf, must present evidence that the voter is qualified to remain registered.  § 163-86(d).  "No challenge

---

[5] Therefore, the Plaintiffs' argument that the "only exceptions to the 90-day bar are inapplicable here" is irrelevant to the Court's determination.  (Doc. 94 at 20).

shall be sustained [by an elections board] unless the challenge is substantiated by affirmative proof. In the absence of such proof, *the presumption shall be that the voter is properly registered or affiliated*." § 163-90.1(b)(emphasis added).

The Beaufort CBOE followed this statutory process in verifying the eligibility of the challenged voters. Only after a preliminary hearing found probable cause and a full hearing on the merits led to the conclusion that a voter was not eligible to vote, did the Beaufort CBOE sustain the challenge and remove the voter from the voter rolls. Indeed, as noted above, the result of the Beaufort CBOE following this process was that around half the challenged voters were verified as eligible and were not removed from the voter rolls. Further, if the Beaufort CBOE merely sought to remove voters, it would not have employed and followed a process that is by its very nature weighted in favor of keeping eligible voters on the voter rolls. Under North Carolina's statutory process, the high standard of probable cause is required to even initiate the process for the removal of the voter. If that standard is not met, the presumption remains that the voter is eligible. Consequently, the process used by the Beaufort CBOE cannot plausibly be said to have the *purpose* of removing voters, even if removal sometimes results when the process is employed.

While following North Carolina's challenge statute may result in the removal of voters, the Plaintiffs have no evidence that removal of voters is the *purpose* behind the challenge statutes. The sole outcome which occurred in the case of every challenged voter was that their eligibility was verified – either as remaining eligible to vote, or not.

This purpose fulfills one of the directives of the NVRA, "to ensure that accurate . . . voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4).

## Conclusion

For the foregoing reasons, the Plaintiffs' Motion for Partial Summary Judgment should be denied as to the Plaintiff and granted in favor of the Beaufort County Defendants.

Respectfully submitted, this the 4th day of April, 2018.

By: /s/ Joshua H. Bennett
Joshua H. Bennett
N.C. State Bar No. 32576
Bennett & Guthrie, P.L.L.C.
1560 Westbrook Plaza Drive
Winston-Salem, North Carolina 27103
Tel: (336) 765-3121
Fax: (336) 765-8622
jbennett@bennett-guthrie.com

*Attorneys for Beaufort County Defendants*

By: /s/ Donald M. Wright
Donald M. Wright, Esq.
N.C. State Bar No. 7410
4804 Holly Brook Drive
Apex, NC 27539
Tel: (919) 618-3601
ncelectionattorney@gmail.com
*Special Appearance Counsel*
*Local Civil Rule 83.1(d)*

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the foregoing Brief is in compliance with the word count limit defined in LR 7.3(d).


/s/ Joshua H. Bennett
Joshua H. Bennett
N.C. State Bar No. 32576
Bennett & Guthrie, P.L.L.C.
1560 Westbrook Plaza Drive
Winston-Salem, North Carolina 27103
Tel: (336) 765-3121
Fax: (336) 765-8622
jbennett@bennett-guthrie.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2018, I electronically filed the foregoing with the clerk of Court using the CM/ECF system which will send notification of such to all counsel of record in this matter.

/s/ Joshua H. Bennett
Joshua H. Bennett
N.C. State Bar No. 32576
Bennett & Guthrie, P.L.L.C.
1560 Westbrook Plaza Drive
Winston-Salem, North Carolina 27103
Tel: (336) 765-3121
Fax: (336) 765-8622
jbennett@bennett-guthrie.com